NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1178n.06

No. 11-5266

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Nov 14, 2012*

DEBORAH S. HUNT, Clerk

ESTATE OF KELLY A. ALLEN, Deceased;
CLAUDIA G. ALLEN; MARIA NICOLE ALLEN,
a minor by next friend, Kenneth B. Allen; ALEXIS
LANE ALLEN, a minor by next friend, Kenneth B.
Allen; WHITNE RICKARD, a minor child,
individually, and as surviving daughter of Donald
Rickard, deceased, by and through her mother
Samantha Rickard, as parent and next friend,

      Plaintiffs-Appellees,

          v.

CITY OF WEST MEMPHIS, et al.,

      Defendants,

OFFICER VANCE PLUMHOFF; OFFICER JOHN
BRYAN GARDNER; OFFICER TONY GALTELLI;
OFFICER LANCE ELLIS; OFFICER JIMMY
EVANS; OFFICER JOSEPH FORTHMAN,
individually and in their official capacity as an officer
of the West Memphis Police Department,

      Defendants-Appellants.

On Appeal from the United
States District Court for the
Western District of
Tennessee

AMENDED

_____/

**Before:**     **GUY and CLAY, Circuit Judges; HOOD, District Judge.[*]**

_____

[*]The Honorable Denise Page Hood, United States District Judge for the Eastern District of Michigan, sitting by designation.

**RALPH B. GUY, JR., Circuit Judge.** This litigation arose following the fatal shooting of Donald Rickard and Kelly Allen by West Memphis, Arkansas police officers. Plaintiffs each brought constitutional claims under 42 U.S.C. § 1983, as well as claims under state law against the individual police officers, the Mayor, and the Chief of Police. At plaintiffs' request all cases were consolidated for trial. All defendants filed motions for summary judgment, but the only issue involved in this appeal is the district court's determination that, as to plaintiff Rickard's excessive force claims, the defendant officers were not entitled to either qualified immunity or immunity under state law from liability for their actions.[1]

## I.

West Memphis, Arkansas Police Officer Joseph Forthman stopped a white Honda Accord on July 18, 2004, at approximately midnight, for the reason that the car had only one operating headlight. The car was driven by Donald Rickard and had one passenger, Kelly Allen, seated in the front passenger seat.

As he approached the car, Forthman noticed an indentation in its windshield. Allen volunteered that the indentation in the windshield resulted from hitting a curb. Forthman

---

[1]The district court dismissed the claims brought against the Mayor and Chief of Police. The court also dismissed the Fourth Amendment excessive force claims of the *Allen* plaintiffs. The *Allen* plaintiffs filed a cross-appeal from the dismissal of their excessive force claims, but the appeal was dismissed *sua sponte* by another panel of this court.

questioned Rickard for a few moments, then asked him to get out of the car. Rather than get

out, Rickard drove away. Forthman got in his police cruiser and began a pursuit.

Several additional West Memphis officers joined in the pursuit. Officer Vance

Plumhoff became the lead officer in the chase. Four additional vehicles joined in the chase,

driven by Officers Jimmy Evans, Lance Ellis, Tony Galtelli, and Bryan Gardner. Video

cameras on three of the vehicles recorded all or part of the chase and subsequent activity.

Rickard entered the I-40 freeway heading east into Memphis and crossed over a bridge

from Arkansas into Tennessee. During the chase, Plumhoff stated on the police radio that

"he just tried to ram me." Forthman's statement that "he is trying to ram another car" was

recorded, followed by his statement that "[w]e do have aggravated assault charges on him."

In deposition, three officers (driving or riding in three different cars) described what

appeared to them to be Rickard attempting to veer and/or ram his car into the moving police

cars, which they reported over the police radio during the pursuit.

After Rickard and the pursuing police officers left the freeway via an exit ramp and

entered Memphis, Tennessee

> the Rickard vehicle turned and exited I-40 onto Danny Thomas Boulevard.
> The pursuit was momentarily on Alabama Avenue before the Rickard vehicle
> turned right onto Danny Thomas Boulevard. At that point, Plumhoff made a
> statement on the radio about ending the pursuit. Evans replied, "terminate the
> pursuit?" Another voice can then be heard on the radio saying, "negative. See
> if you can get in front of him." As the Rickard vehicle approached Jackson
> Avenue, it made a quick right turn onto Jackson Avenue and contact occurred
> between the Rickard vehicle and a police vehicle. The contact caused the
> Rickard vehicle to spin around in a parking lot at the intersection of Danny
> Thomas Boulevard and Jackson Avenue. Separate Defendants assert that the

Rickard vehicle then turned directly toward Plumhoff's vehicle and had a head-on collision with it. Plaintiffs dispute these statements and aver that the Rickard vehicle was still moving forward from the momentum caused by the spinout after contact with Evans' vehicle and that this momentum caused the collision with Plumhoff's vehicle.

At or near this stage of events, the other officers formed a semicircle around the Rickard vehicle, attempting to use the building in the parking lot to prevent the vehicle from fleeing. Because of the building and the location of the police cars, the only unobstructed way for Rickard to escape was to back up. Rickard reversed in an attempt to escape, and as he did so Evans and Plumhoff exited their vehicles and approached the Rickard vehicle. Evans tried to get into the vehicle by pounding on the passenger-side window with his gun in his hand. Gardner and other officers also approached the vehicle. At this point, the wheels of the Rickard vehicle were spinning, and the vehicle made contact with Gardner's vehicle. Separate Defendants assert that the vehicle's engine was "revving," but Plaintiffs dispute this and state that the vehicle was rocking back and forth, and it is unclear whether the engine noise in conjunction with this rocking motion should be characterized as revving the engine.

Plumhoff fired three shots into the Rickard vehicle. The video from unit # 279 shows that Plumhoff was near the passenger-side of the vehicle when he fired those shots. The Rickard vehicle then reversed in a 180 degree arc onto Jackson Avenue heading east. As the Rickard vehicle reversed, Galtelli exited his vehicle and ran to join the other officers who were chasing the vehicle as it maneuvered onto Jackson Avenue. Ellis was standing near the rear passenger-side of Rickard's vehicle and had to step to his right to avoid the vehicle. Gardner then fired ten shots toward the vehicle, initially from the passenger side and then from the back of the vehicle. Gardner fired all ten shots while the vehicle was moving forward (i.e., away from the officers). Galtelli also fired two shots at the vehicle. As the officers were shooting, Rickard was fleeing down Jackson Avenue. Rickard then lost control of the vehicle, and the Rickard vehicle crashed into a building at the corner of Jackson Avenue and Manassas Street. Both Rickard and Allen were killed.

*Estate of Allen, et al. v. City of West Memphis, et al.*, Nos. 05-2489/2585, 2011 WL 197426,

at *3 (W.D. Tenn. Jan. 20, 2011) (citations omitted) (unpublished).

In its ruling on summary judgment as to the Rickard claims brought under § 1983, the district court determined that the facts, considered in a light most favorable to the plaintiff, established a violation of the Fourth Amendment. *Id*. at *10. Next, the district court found that the facts did not support the finding that a reasonable officer would have considered Rickard's continued flight a clear risk to others. *Id*. at *11. For this reason, the district court denied qualified immunity to all of the officers on the scene as to the Rickard § 1983 claims.

Concerning the Rickard state law claims, the district court determined that Tennessee law applied, and that the officers were therefore not eligible for statutory immunity under Arkansas law. The district court also determined that immunity was not available to the officers under various provisions of Tennessee law. *Id*. at *14-15.

This appeal followed the district court's ruling. After it was filed, the Rickard plaintiff moved to dismiss the appeal for lack of jurisdiction. A panel of this court initially granted the motion on the grounds that the qualified immunity determination of the district court turned on disputed factual issues. That order was vacated, and the issue was referred to the merits panel, following the defendants' petition for rehearing.[2]

## II.

### A.    Qualified Immunity

---

[2]On September 14, 2011, this court granted rehearing to consider our jurisdiction to review the denial of state law immunity, vacated our earlier dismissal of the qualified immunity appeal, and referred the entire motion to dismiss for action by the merits panel.

A motion for qualified immunity denied on the basis of a district court's determination that there exists a triable issue of fact generally cannot be appealed on an interlocutory basis. *Johnson v. Jones*, 515 U.S. 304, 313 (2005).  The Supreme Court, however, carved out an exception to this rule in *Scott v. Harris*, 550 U.S. 372 (2007).  The Court emphasized that: "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id*. at 380 (citations omitted).  Reconciling *Scott* and *Johnson*, we stated that "where the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false, a court of appeals may say so, even on interlocutory appeal." *Moldowan v. City of Warren*, 578 F.3d 351, 370 (6th Cir. 2009) (citations and internal quotation marks omitted); *see also Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012) (after viewing video, affirmed denial of qualified immunity).

What makes these cases particularly relevant to the case at bar is the similarity of the facts here to the facts in *Scott*.  The multi-car police chase of a fleeing speeder in *Scott* ended when one of the police cars intentionally rammed into the back of the fleeing car causing it to leave the road and crash, resulting in crippling injuries to the driver.  All of this was captured on videotape. When the subsequent excessive force case was brought by the injured driver, the police defendant sought the protection of qualified immunity, which was denied. On interlocutory appeal, the court of appeals affirmed.  The Supreme Court granted review and reversed.  As might be expected, the police defendants in our case vigorously argue that

*Scott* should control. Although the framework of the two cases is similar, as always, the devil is in the details, and it is those details that cause us to conclude that *Scott* is distinguishable.

The fleeing motorist in *Scott* was still fleeing at very high speeds when he was rammed from behind. *Scott* framed the issue as: "Can an officer take actions that place a fleeing motorist at risk of serious injury or death in order to stop the motorist's flight from endangering the lives of innocent bystanders?" The Court answered this question in the affirmative. In our case, the fleeing vehicle was essentially stopped and surrounded by police officers and police cars although some effort to elude capture was still being made.

Further, although the police in *Scott* used a maneuver to stop the fleeing car that might very well cause a crash and injury, the police here fired fifteen shots at close range, all but two of which apparently hit the subjects and twelve of which hit the driver. It's also worthy of note that when deciding to use lethal force, the police knew there was a passenger in the fleeing vehicle thus doubling the risk of death. The police make much of the fact that they felt they were in personal danger, but the degree to which that was true is not resolved by the video recordings.

Also, since the plaintiff in *Scott* survived, there were actually three versions of what occurred: the plaintiff's, the police defendants' and the video. The Supreme Court, in reversing the court of appeals, determined that the video resolved the questions at issue and granted summary judgment in favor of the defendant. It wasn't that the video did not support

plaintiff's version of what occurred, but rather that conceding plaintiff's version which was supported by the video, the conduct of the officer was reasonable as a matter of law. This is what the defendants ask us to conclude in this case.

However, the case at bar is more complex in its facts than was *Scott*. After carefully reviewing the video, as did the district judge, we cannot conclude that it provides clear support for either the plaintiff's or the defendants' version of what occurred. That is particularly true as it relates to the degree of danger that the officers were placed in as a result of Rickard's alleged conduct. Unlike in *Scott*, we cannot conclude that the officers' conduct was reasonable as a matter of law.[3]

Defense counsel stated at oral argument, in essence, that if lethal force is justified, officers are taught to keep shooting until the threat is over. The dictionary synonym for "lethal" is "deadly." As the Court in *Scott* explained in distinguishing the use of deadly force in *Tennessee v. Garner*, 471 U.S. 1 (1985), "'[a] police car's bumping a fleeing car is, in fact, not much like a policeman's shooting a gun so as to hit a person.'" *Scott*, 550 U.S. at 383 (quoting *Adams v. St. Lucie County Sheriff's Dept.*, 962 F.2d 1563, 1577 (11th Cir. 1992) (Edmonson, J., dissenting), *adopted by* 998 F.2d 923 (11th Cir. 1993) (en banc)). Nor does the Supreme Court's decision in *Sykes* compel a different result. *Sykes v. United States*, 131 S. Ct. 2267 (2011). The holding in *Sykes* that vehicular flight from an officer may categorically present "a serious potential risk of physical injury to another" so as to constitute

---

[3]The district court made a number of findings as to disputed issues of fact, which we do not repeat here, and which we cannot say were "blatantly and demonstrably false."

a "violent felony" for purposes of sentencing enhancement under 18 U.S.C. § 924(e) addresses a question distinct from whether the force applied—including deadly force—to effect the seizure of a fleeing suspect in a given case was objectively reasonable as a matter of law under the Fourth Amendment.[4]

Usually, when we review an appeal from a denial of qualified immunity, we dismiss the appeal for lack of jurisdiction if the immunity was denied on the basis of genuine factual disputes. *Johnson*, 515 U.S. at 307. After *Scott*, however, it would appear that an interlocutory appeal of a denial of qualified immunity which makes a good faith *Scott* claim requires us to review the record. *Scott*, 550 U.S. at 319 ("we concede that a court of appeals may have to undertake a cumbersome review of the record"). After this review if we reach the same conclusion as did the district judge, as we do here, it would seem that what we are doing is affirming that judgment. Whether we call it a dismissal for lack of jurisdiction or an affirmance of the denial of qualified immunity, the result is the same. *See, e.g.*, *Austin*, 690 F.3d at 498-99.

**B.      State Law Immunity**

---

[4]We note that the officers have filed all pleadings as a group and no distinctions were made among the officers. In *Bishop v. Hackel*, 636 F.3d 757, 767 (6th Cir. 2011), a qualified immunity appeal, the panel held "[t]he district court erred in this case by failing to evaluate the liability of each Deputy individually" and then proceeded to do so. We have not been asked to make such a review, nor have the defendants raised as an issue on appeal that there was no individual determination made in the district court. Nothing in this opinion, however, precludes the district court from considering on remand whether the individual defendants who did not fire their weapons may be entitled to qualified immunity. Additional discovery may be taken if necessary.

The officers also contend they should be immune from liability under state law, and that the district court erred in determining they were not. These determinations by the district court are legal determinations, and our review is *de novo*. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).

The ruling of the district court concerning immunity under Arkansas law is only summarily addressed by the officers. Defendants state only that: "The trial court ruled that the officers were not eligible for statutory immunity pursuant to Arkansas law because they were in Tennessee: this is a question of law that this court can resolve." The officers do not dispute that Tennessee law applies to their state law claims, and have presented neither argument nor authority to establish why they might be entitled to statutory immunity under Arkansas law. We find this issue to lack merit and, in any case, to have been waived on appeal. *See United States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008) (holding issues adverted to in only a perfunctory manner, unaccompanied by any effort at developed argument, are deemed waived).

Defendants rely first on the Interstate Fresh Pursuit Act, Tenn. Laws Ann. § 40-7-201, *et seq.*, to claim entitlement to immunity under Tennessee law. This statute gives officers of another state (here, Arkansas), who enter into Tennessee in "fresh pursuit" of a person they believe to have committed a felony in that other state, authority regarding actions they take to effect arrest and hold suspects in custody in Tennessee. As plaintiff points out,

however, nothing in that statute addresses a police officer's *immunity* from suit for alleged civil rights violations, and we decline to further address this issue.

The officers' additional assertion that they are entitled to immunity under the Tennessee Governmental Tort Liability Act (TGTLA), Tenn. Code Ann. § 29-20-101 *et seq.*, merits no further consideration. The defendants, officers from West Memphis, Arkansas, do not contest the district court's determination that they do not meet the statute's requirements because "employees" covered by the statute are those of "governmental entities," which is defined as "any political subdivision of the *State of Tennessee*." TENN. CODE. ANN. § 29-20-102(3) (emphasis added).

Finally, defendants argue that Tennessee's public duty doctrine shields them against negligence claims brought by plaintiff. The public duty doctrine is aimed at shielding a public employee from liability for an injury to an individual member of the public due to the public employee's breach of a duty owed to the public at large. As discussed in *Ezell v. Cockrell*, 902 S.W.2d 394 (Tenn. 1995), various public policy considerations support the recognition of the public duty doctrine, such as avoiding landing police officers in the "untenable position of insuring the personal safety of every member of the public, or facing a civil suit for damages." *Id*. at 398. The doctrine would not offer an officer protection from liability for an injury to the subject of the pursuit whose civil rights were allegedly infringed by that officer. The doctrine has no application here.

**AFFIRMED.**

**CLAY, Circuit Judge, concurring**. The majority states in footnote four: "Additional discovery may be taken if necessary." This language is at the very least misleading. It should be noted that additional discovery is not necessary for the qualified immunity inquiry here, because a qualified immunity defendant must argue "merely that his alleged conduct did not violate clearly established law." *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). Defendants "must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case." *Id*.; *Marvin v. City of Taylor*, 509 F.3d 234, 244 (6th Cir. 2007). Additional discovery with regard to the qualified immunity inquiry would run contrary to caselaw and thwart its purpose. *Skousen v. Brighton High School*, 305 F.3d 520, 527 (6th Cir. 2002) ("By refusing to address qualified immunity when it was raised, the district court had undercut one of the primary rationales for such immunity—to save officials from unwarranted discovery.") Thus, the language of footnote four risks confusing the district court into believing it would need to take additional discovery with respect to its qualified immunity determination; it does not.

To the extent the language merely encourages the district court to proceed with managing the case, which may include conducting additional discovery related to the merits of each claim asserted against each defendant following this appeal, the district court is fully aware of its power to do so.