RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0179p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANGELO DILUZIO,

            *Plaintiff-Appellee,*

    *v.*

VILLAGE OF YORKVILLE, OHIO, JOHN DIFILIPPO, and KEVIN KLUBERT (14-3970); JOHN MORELLI and JERRY DAVIS (14-3971),

            *Defendants-Appellants.*

Nos. 14-3970/3971

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:11-cv-01102—Michael H. Watson, District Judge.

Decided and Filed: August 6, 2015

Before: BATCHELDER, ROGERS, and KETHLEDGE, Circuit Judges

---

## COUNSEL

**ON BRIEF:** Robert H. Stoffers, Frank H. Scialdone, Jason R. Deschler, MAZANEC, RASKIN & RYDER CO., L.P.A., Columbus, Ohio, for Appellants in 14-3970. Michael J. Valentine, Melvin J. Davis, REMINGER CO., LPA, Columbus, Ohio, for Appellants in 14-3971. James D. McNamara, Columbus, Ohio, for Appellee.

---

## OPINION

---

ALICE M. BATCHELDER, Circuit Judge. In this interlocutory appeal from the district court's denial of a claim of qualified immunity, the defendants argue that the plaintiff's evidence

1

did not create genuine disputes of material fact so as to overcome summary judgment. For the reasons that follow, we establish our appellate jurisdiction and AFFIRM.

**I.**

The defendants in this case are the Village of Yorkville (Ohio), Mayor John DiFilippo, Fire Chief Kevin Klubert, Police Chief John Morelli, demolition contractor Greg Nemeth, and Police Officer Jerry Davis. The plaintiff, Angelo DiLuzio, owned three adjacent buildings in the heart of downtown Yorkville, and those buildings caught fire under suspicious circumstances. Fire Chief Klubert led the firefighting effort and coordinated with Mayor DiFilippo on a decision to demolish a portion of one of the burned buildings immediately, without any inspection or formal decision on the need for demolition. Fire Chief Klubert and Mayor DiFilippo had ordered Officer Davis to find DiLuzio and bring him to a meeting, which—against DiLuzio's wishes—he did. At that meeting, DiLuzio insisted the buildings could be repaired and he departed believing that the matter was ended. Mayor DiFilippo nonetheless ordered Nemeth to demolish most of the south building, though he left one wall standing and left the middle building intact, even though it had suffered the worst damage because the fire had started there.

Less than a week later, Police Chief Morelli (acting on orders from Mayor DiFilippo) approached DiLuzio's son with a low-ball offer from an anonymous investor, to purchase the property "as is." DiLuzio declined and Chief Morelli approached DiLuzio himself with a similar, but lower, "as is" offer about two months later. DiLuzio declined again and Morelli, Klubert, and DiFilippo began to issue fire department citations to DiLuzio, threatening $600 per day fines until he cleaned up the property. When the Village solicitor dismissed the first of these citations, which had included false statements about inspections and authorizations, Morelli falsified and forged a State Fire Marshall citation threatening $1,000 per day fines. This too was dismissed after the State Fire Marshall revealed it was a forgery. The Village then passed a criminal ordinance concerning unkempt properties and Morelli charged DiLuzio under it, at one point falsely notarizing his own signature by using a rubber stamp of DiFilippo's signature.

Eventually, DiLuzio filed a 42 U.S.C. § 1983 action in federal court, claiming due process violations, among other things, as well as federal conspiracy charges and state law offenses. Basically, DiLuzio theorized that Mayor DiFilippo wanted him to sell his property to a

developer, so DiFilippo had knowingly faked the emergency situation as an excuse to order the demolition and then used the threat of the huge daily fines to pressure DiLuzio to sell. DiLuzio has discovered and introduced into the record evidence that supports his theory.

The defendants moved for summary judgment, primarily on the basis of qualified immunity, but also on a basic theory that DiLuzio could not prove his claims. The district court granted summary judgment on several claims, but denied it on others. Specifically, as pertinent here, the court denied qualified immunity to Mayor DiFilippo and Fire Chief Klubert on the due process claim concerning demolition of the building, denied qualified immunity to Police Chief Morelli and Officer Davis on substantive due process claims, and denied qualified immunity to Nemeth because he was not a state actor. The court also denied summary judgment on the conspiracy claims and certain state law claims, and to the Village on final-decision-maker liability claims. All but Nemeth appealed, citing the denial of qualified immunity as a predicate jurisdictional claim and urging pendant appellate jurisdiction for their other claims.

## II.

Qualified immunity shields government officials in the performance of discretionary functions from standing trial for civil liability unless their actions violate clearly established rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A plaintiff who brings a § 1983 action against such an official bears the burden of overcoming the qualified immunity defense. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013). At the summary judgment stage, the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established. *Id*. at 680. In so doing, the plaintiff must, at a minimum, offer sufficient evidence to create a "genuine issue of fact," that is, "evidence on which [a] jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 256 (1986).

Put another way, if the district court determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, the court must deny summary judgment. *Cf. Quigley*, 707 F.3d at 681. As the denial of summary judgment is ordinarily not a final decision within the meaning of 28 U.S.C. § 1291, it is generally not immediately appealable. But the "denial of a claim of qualified immunity, to the extent that

it turns on an issue of law, is an appealable 'final decision' within the meaning of [] § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

Thus, we may decide an appeal challenging the district court's *legal* determination that the defendant's actions violated a constitutional right or that the right was clearly established. *Id*. We may also decide an appeal challenging a *legal* aspect of the district court's factual determinations, such as whether the district court properly assessed the incontrovertible record evidence. *See Plumhoff v. Rickard*, 572 U.S. --, 134 S. Ct. 2012, 2019 (2014); *Roberson v. Torres*, 770 F.3d 398, 402 (6th Cir. 2014). And we may decide, as a *legal* question, an appeal challenging the district court's factual determination insofar as the challenge contests that determination as "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Plumhoff*, 134 S. Ct. at 2020; *Roberson*, 770 F.3d at 402; *Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 496 (6th Cir. 2012) ("In exceptional circumstances, an appellate court may overrule a district court's determination that a factual dispute exists where evidence in the record establishes that the determination is 'blatantly and demonstrably false.'" (relying on *Bishop v. Hackel*, 636 F.3d 757, 769 (6th Cir. 2011)).

We may not, however, decide an appeal challenging the district court's determination of "'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial." *Johnson v. Jones*, 515 U.S. 304, 313 (1995). Because such a challenge is purely fact-based, lacking any issue of law, it "does not present a legal question in the sense in which the term was used in *Mitchell*," *Plumhoff*, 134 S. Ct. at 2019, and is therefore not an appealable "final decision" within the meaning of 28 U.S.C. § 1291. These types of prohibited fact-based ("evidence sufficiency") appeals challenge directly the plaintiff's allegations (and the district court's acceptance) of "what [actually] occurred[] or why an action was taken or omitted," *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011), who did it, *Johnson*, 515 U.S. at 307, or "nothing more than whether the evidence could support a [jury's] finding that particular conduct occurred," *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996). We have also held that a defendant may not challenge the inferences the district court draws from those facts, as that too is a prohibited fact-based appeal.

*Romo v. Largen*, 723 F.3d 670, 673-74 (6th Cir. 2013).**[1]** As a rule, we either dismiss these fact-based ("evidence sufficiency") appeals for lack of jurisdiction or excise the prohibited challenge. *See Behrens*, 516 U.S. at 312-13 ("Denial of summary judgment often includes a determination that there are controverted issues of material fact and *Johnson* surely does not mean that *every* such denial of summary judgment is nonappealable." (internal citation omitted)).

As a matter of practical application, this is merely to say that we may not decide a challenge directly to the district court's determination of the record-supported evidence or the inferences it has drawn therefrom, but we may decide a challenge with any legal aspect to it, no matter that it might encroach on the district court's fact-based determinations. *See Roberson*, 770 F.3d at 403 ("*Plumhoff* appears to cabin the reach of *Johnson* to *purely* factual issues that the trial court might confront if the case were tried." (quotation marks omitted; emphasis added)); *Family Serv. Ass'n v. Wells Tp.*, 783 F.3d 600, 607 (6th Cir. 2015) ("*Johnson* applies to interlocutory appeals that *solely* contest the plaintiff's account of the facts." (emphasis added)); *see also Rudlaff v. Gillispie*, -- F.3d --, No. 14-1712, 2015 WL 3981335, *2 (6th Cir. 2015).

And, in the event that legal and factual challenges are confused or entwined, "we must separate an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is 'genuine')." *Roberson*, 770 F.3d at 402 (citing *Johnson*, 515 U.S. at 319) (quotation marks omitted).

---

**[1]**Although an argument could be made that the Supreme Court has rejected this this proposition (thus implicitly overruling *Romo*), we decline to make such a holding. In *Plumhoff*, the police fatally shot a fleeing driver, the plaintiff sued claiming excessive force, and the accused officers moved for summary judgment on qualified immunity grounds. *Estate of Allen v. City of West Memphis*, No. 05-2489, 2011WL197426, *1-3 (W.D. Tenn., Jan. 20, 2011). The district court denied the motion by drawing certain inferences from the evidence: e.g., "it is not clear that [t]his evasion of arrest was sufficiently dangerous to justify deadly force," *id.* at *9; "a reasonable jury could determine that the [officers'] belief that danger was imminent was not reasonable," *id.* at *10; "the officers had no reason to believe that the suspects were violent or would continue to pose a threat if they were not apprehended," *id.*

On direct appeal, we affirmed and accepted those inferences, but with sparse discussion. *Estate of Allen v. City of West Memphis*, 509 F. App'x 388, 392-93 (6th Cir. 2012). In reversing the decision, however, the Supreme Court considered the same evidence but drew the opposite inferences: "all that a reasonable police officer could have concluded was that [the driver] was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road," *Plumhoff*, 134 S. Ct. at 2022. That is, the Court drew its own inferences from the evidence, it did not defer to the district court's inferences. But the Court did not discuss its approach to assessing the inferences and the question of deference (or jurisdictional effect) was not at issue. Moreover, those were inferences drawn from incontrovertible video evidence, not inferences drawn in the light most favorable to the plaintiff from the plaintiff's record-supported evidence, as we have here and as is the typical case. Because this latter distinction may matter and because *Plumhoff* offers no consideration of the issue, we decline to read *Plumhoff* as deciding this issue in the ordinary case. Accordingly, *Romo* remains the law of the Circuit.

Similarly, we can separate an appellant's reviewable challenges from its unreviewable. *See, e.g., Wenk v. O'Reilly*, 783 F.3d 585, 599 (6th Cir. 2015) (recognizing that the appellant improperly premised his arguments on *his* evidence and *his* version of the disputed facts, despite his purporting to accept the plaintiff-appellee's version, and proceeding with our appellate review by accepting the plaintiff-appellee's version of the disputed facts and evidence); *Romo*, 723 F.3d at 674 & n.2 (6th Cir. 2013) (recognizing that the appeal improperly challenged the soundness of the district court's finding of a genuine dispute of material facts, but accepting appellate jurisdiction by ignoring the "factual disputations" and "ruling on what [wa]s properly before us [while] say[ing] nothing about what [wa]s jurisdictionally not before us"). That is, we can "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (deciding based on the plaintiff's record facts).

In so doing, because we defer to the district court's factual determinations, ideally we need look no further than the district court's opinion for the facts and inferences cited expressly therein. That is, in deciding these legal challenges on interlocutory appeal from the denial of qualified immunity, we often may be able merely to adopt the district court's recitation of facts and inferences. *See Johnson*, 515 U.S. at 319. Of course, in briefing or arguing for reversal on legal grounds, the defendant-appellant may—indeed, for some arguments, must—point to some other of the plaintiff's record evidence, or some incontrovertible record evidence, to support that argument. *See, e.g., Scott*, 550 U.S. at 380; *Bishop*, 636 F.3d at 769. Alternatively, or correspondingly, the plaintiff-appellee may point to additional record evidence in support of its position, or to bolster the district court's determination. Thus, while we need not engage in a plenary review of the record, neither are we limited to only the facts, evidence, or inferences that the district court has stated expressly. *See Estate of Carter*, 408 F.3d at 310 (relying on the "facts as alleged by the Estate"). Rather, we must make the *legal* determination of whether the defendant violated a clearly established right, based on those now (for this purpose) undisputed record facts, i.e., "once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*." *Scott*, 550 U.S. at 381 n.8. Moreover, the presumption favoring the district court's factual determinations is such that, if the district court has cited no facts or evidence (e.g., has "simply den[ied the] summary

judgment motion[] without indicating [its] reasons for doing so"), we "may have to undertake a cumbersome review of the record to determine what facts the district court . . . likely assumed." *Johnson*, 515 U.S. at 319 (quoted with approval in *Behrens*, 516 U.S. at 313).

Finally, it bears mention that, in accepting the district court's factual determinations and relying on the plaintiff's record evidence for the purpose of deciding the interlocutory appeal, we do not ourselves make any findings of fact or inference for purposes of any subsequent proceedings. *See, e.g.*, *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1293 (11th Cir. 2010) ("[A]s everyone knows, appellate courts may not make fact findings."); *Nelson v. Shuffman*, 603 F.3d 439, 448 (8th Cir. 2010) ("Whether [the plaintiff] is ultimately able to prove the alleged factual bases for his claims is a matter left for the finder of fact [on remand]—not the appellate court on interlocutory appeal."); *Golden Bridge Technology, Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1323 (Fed. Cir. 2008) ("Appellate courts review district court judgments; we do not find facts.").

In this appeal, the defendants proclaim that they are accepting plaintiff DiLuzio's version of the facts but, in reality, they rest each of their arguments (but for one) on their own version of the disputed facts and the inferences they would draw from them. For each of their challenges, we will discard the fact-based or "evidence sufficiency" portion of the appeal—that is, any challenge to the district court's view of the facts or its associated inferences or, more frequently, any challenge to plaintiff DiLuzio's version of the record-supported evidence—and resolve the legal challenge based on those given facts and inferences. *See Estate of Carter*, 408 F.3d at 310.

**Police Chief John Morelli**

DiLuzio says Police Chief John Morelli violated his substantive due process rights through an abuse of authority when he pressured DiLuzio "to sell his property to a private third party[,] and [then] punish[ed] him for not doing so." R. 159 at 25. Chief Morelli denies doing any of this and insists that he merely decided that the property contained a nuisance and made valid efforts to get DiLuzio to abate that nuisance, which does not rise to the level of a substantive due process violation, R. 159 at 22-23. We have no jurisdiction to review Chief Morelli's disagreement with the facts (or inferences therefrom) as that is solely a challenge to DiLuzio's evidence. *Plumhoff*, 134 S. Ct. at 2019; *Johnson*, 515 U.S. at 319-20. But we can, for purposes of this appeal from the denial of summary judgment, either adopt the district court's

determination of the facts or accept DiLuzio's record-supported facts, and decide as a matter of law whether Chief Morelli's conduct violated substantive due process. *See Estate of Carter*, 408 F.3d at 310. Those facts include: that it was Morelli who conveyed the low-ball, "as is" purchase offers four days after the fire and again two months later (and lied about doing so); ordered Fire Chief Klubert to issue the fire department citation just two days later, based on falsehoods that Fire Safety Inspector John Captor had inspected the property and Village Solicitor Bob Stickles had approved the citation; falsified the State Fire Marshal citation on State letterhead, which was unauthorized and contained known falsehoods; and filed two subsequently withdrawn criminal complaints, on one of which he notarized his own oath and signature by using a rubber stamp of Mayor DiFilippo's signature. A jury could reasonably find from this evidence that Chief Morelli "intended to injure" DiLuzio in a way "unjustifiable by any governmental interest" such that his conduct "shocks the conscience" and violates substantive due process. *See Caldwell v. City of Louisville*, 120 F. App'x. 566, 574 (6th Cir. 2004) (internal quotation marks omitted).

For the same reason, Chief Morelli is not entitled to state law immunity under Ohio Revised Code § 2744.03(A), which specifically excepts acts done "with malicious purpose, in bad faith, or in a wanton or reckless manner," § 2744.03(A)(6)(b). In Ohio, for purposes of this provision, "'[b]ad faith' involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another." *Cook v. Cincinnati*, 658 N.E.2d 814, 821 (Ohio App. Ct. 1995). A jury could reasonably find from DiLuzio's evidence that Chief Morelli acted in bad faith.

DiLuzio also says Police Chief Morelli conspired with others in "baseless legal . . . campaigns against [him] in an effort to force him to sell his property," R. 159 at 28. Chief Morelli denies that he was pressuring DiLuzio to sell his property and insists that he just tried to trick DiLuzio into cleaning it up. R. 159 at 29. Chief Morelli argues that two facts prove his explanation: (1) the Village ceased its legal campaign against DiLuzio once he cleaned the property and (2) DiLuzio admitted that he would have sold his property for the right price. But, as the district court explained, these facts do not prove this explanation: the low-ball "as is" purchase offer would not encourage a cleanup rather than a sale and DiLuzio did, in fact, reject

Morelli's low-ball offers.   We have no jurisdiction to reconsider the facts underlying Chief Morelli's challenges to DiLuzio's evidence or to second-guess the inferences the district court drew from those facts.  *Johnson*, 515 U.S. at 319-20; *Romo*, 723 F.3d at 673-74.   But we can decide, as a matter of law, whether those record-supported facts and inferences could prove the conspiracy, *see Estate of Carter*, 408 F.3d at 310, considering that it was Morelli who conveyed the purchase offer to DiLuzio on Mayor DiFilippo's instruction; directed Fire Chief Klubert's issuance of the fire department citation; forged the State Fire Marshal citation with DiFilippo's approval; and filed criminal complaints with DiFilippo's encouragement.  Given that a plaintiff may, and often must, prove a conspiracy through circumstantial evidence, *Webb v. United States*, 789 F.3d 647, 671 (6th Cir. 2015), we agree with the district court that a jury could reasonably find from the proffered evidence that "there existed a plan between [Police] Chief Morelli and Mayor DiFilippo to undertake a series of flawed legal actions to force [DiLuzio] to sell his property and [to] punish him for not doing so."  R. 159 at 30.

**Police Officer Jerry Davis**

DiLuzio says Police Officer Jerry Davis unlawfully physically seized him, despite his verbal refusal, and placed him in a police car to drive him to a meeting.  R 159 at 31.  Officer Davis denies grabbing DiLuzio or ordering him anywhere and instead insists that he merely gave DiLuzio a ride, which DiLuzio requested, and such conduct is not unlawful, R. 159 at 31-33.  We have no jurisdiction to review Officer Davis's disagreement with the facts, as that is solely a challenge to DiLuzio's evidence.  *Johnson*, 515 U.S. at 319-20.  But we can accept DiLuzio's record-supported facts and decide as a matter of law whether Davis's conduct violates the Fourth Amendment.  The district court summarized DiLuzio's evidence as: "in response to [DiLuzio]'s assertion that he did not want to go . . . Officer Davis told [him], 'you're going with me,' grabbed [his] left arm, put his other arm around [DiLuzio's] shoulder, and physically escorted [him] to the police cruiser, all while in his police uniform."  R. 159 at 34-35.  Given that Officer Davis admittedly had no just reason for "seizing" DiLuzio and "[a] 'seizure' occurs when police detain an individual under circumstances where a reasonable person would not feel free to leave," *United States v. Lopez-Medina*, 461 F.3d 724, 739 (6th Cir. 2006), a jury could

reasonably find from DiLuzio's evidence that a reasonable person would not have felt free to ignore Officer Davis in this context, meaning that Davis's conduct was an unlawful seizure.

**Mayor John DiFilippo**

DiLuzio says Mayor John (Jake) DiFilippo knew that DiLuzio's building was not actually in a dangerous condition, but DiFilippo had a secret personal desire to demolish the building and coerce DiLuzio to sell that property, so he lied (saying that an emergency dangerous condition necessitated quick action) as a pretext for proceeding immediately with the partial demolition, before DiLuzio could stop him via predeprivation process.  R. 161 at 14.  Mayor DiFilippo denies that he lied and insists that he thought the burned building created an emergency because of its dangerous condition and necessitated immediate demolition.  From this, DiFilippo argues that because he was addressing an emergency condition, he was entitled to judgment as a matter of law pursuant to either *Parratt v. Taylor*, 451 U.S. 527 (1981), or *Harris v. City of Akron*, 20 F.3d 1396 (6th Cir. 1994).  We have no jurisdiction to decide Mayor DiFilippo's appeal to the extent that he insists he believed that the damage to DiLuzio's building created an unsafe condition requiring immediate demolition.  That argument is solely a challenge to DiLuzio's evidence suggesting that Mayor DiFilippo never actually believed that demolition was necessary, and instead simply used the fire as an excuse to destroy DiLuzio's property and thereby force him to sell.  But we can decide, as a matter of law, whether Mayor DiFilippo's conduct violated procedural due process if it was pretextual, as the district court inferred from DiLuzio's record-supported facts, which included: the very early call to the demolition contractor (Nemeth) before there was even any visible fire, let alone damage; the questionable (highly suspect) firefighting tactics employed; DiLuzio's account of the meeting; the absence of any pre-demolition inspection; the demolition of the south building instead of the fire-damaged middle building; the failure to document the decision-making or demolition; third-party testimony that Fire Chief Klubert did not believe demolition was necessary but did it on DiFilippo's orders; testimony from other firemen, the State Fire Marshall inspector, and building experts that demolition was unnecessary; and the circumstances surrounding the purchase offers, among many other things. The district court cited some of DiLuzio's record evidence in its opinion, R. 161 at 31-32, and in his brief on appeal DiLuzio has pointed us to additional supporting record facts.

Under *Parratt*, 451 U.S. at 543, due process does not require *pre*-deprivation notice-and-hearing process when the State is in no position to provide it because the deprivation was due to a defendant official's random or unauthorized act. *See Lane v. City of Pickerington*, 588 F. App'x 456, 466 (6th Cir. 2014) (quoting *Hudson v. Palmer*, 468 U.S. 517, 534 (1984)); *Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir. 1991) ("In *Parratt* cases, then, the facts are such that pre-deprivation remedies are impossible and adequate post-deprivation remedies are all that is required by due process."). Similarly, under *Harris*, 20 F.3d at 1401, "[w]hen the situation necessitates 'quick action' by the [S]tate or makes efforts to provide a meaningful predeprivation process impracticable, the persons acting under state authority may proceed without violating the property owner's rights so long as the state provides an adequate postdeprivation procedure."

DiLuzio has produced admissible evidence to support his theory that Mayor DiFilippo acted in bad faith, that there was actually no emergency condition or necessity for quick action, and that nothing prevented the Village (or DiFilippo) from providing pre-deprivation process. Consequently, *Parratt* and *Harris* do not apply in this case. Simply put, officials cannot deny citizens due process by falsely invoking an emergency need for quick action. *See Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 418 (3d Cir. 2008) ("That is, we cannot apply so much deference as to allow the government to avoid affording due process to citizens by arbitrarily invoking emergency procedures." (quotation and editorial marks omitted)). The district court held that "a genuine issue of material fact exists as to whether [the] [d]efendants' justification for demolishing [DiLuzio]'s building was mere pretext." R. 161 at 17, 32, 38.

Mayor DiFilippo responds that if he acted in bad faith, then his decision to demolish DiLuzio's building was a "random and unauthorized" act, such that predeprivation due process was unnecessary, pursuant to *Parratt*. An official's act is "random and unauthorized" if it was unpredictable and he was "not acting pursuant to any established state procedure." *Zinermon v. Burch*, 494 U.S. 113, 130 (1990). Here, Mayor DiFilippo claims to have acted pursuant to Ohio Revised Code § 715.26(B), which authorizes municipalities to demolish private buildings "[i]f an emergency exists, as determined by" the municipality. Thus, DiFilippo's decision was not "random or unauthorized," regardless of whether he acted with "intent to injure" DiLuzio or in bad faith as to whether an emergency actually existed. *See Harris*, 20 F.3d at 1403.

DiLuzio also argues that Mayor DiFilippo conspired with others to "misuse their official positions to plan, organize, and conduct the destruction of [his] building without due process." R. 161 at 41. DiFilippo denies any wrongdoing and insists that, at a minimum, he didn't know that what he was doing was wrong. Again, we lack jurisdiction to decide a disagreement with DiLuzio's evidence, *Johnson*, 515 U.S. at 319-20, and DiLuzio could prevail on his facts, as was thoroughly explained above. But DiFilippo also contends that, even if he acted as alleged and knew his actions were wrong, we must dismiss DiLuzio's conspiracy claim under the intracorporate conspiracy doctrine, which "provides that members of the same legal entity cannot conspire with one another as long as their alleged acts were within the scope of their employment." *Burgess v. Fischer*, 735 F.3d 462, 483 (6th Cir. 2013). The district court acknowledged the lack of controlling authority, inasmuch as the Sixth Circuit has never held that the intracorporate conspiracy doctrine applies to municipal government officials in a § 1983 action and the district courts within our circuit are split on this question. R. 161 at 42-43. The district court here determined that either the doctrine does not apply, citing *Kinkus v. Village of Yorkville*, 476 F. Supp. 2d 829, 839 (S.D. Ohio 2007) (rev'd on other grounds, 289 F. App'x 86 (6th Cir. 2008)), or this case fell within the exception for defendants acting outside of their scope of employment, citing *Briner v. City of Ontario*, No. 1:07-cv-129, 2010 WL 3982755, *14 (N.D. Ohio, Oct. 7, 2010). DiFilippo argues that this court has held implicitly that the doctrine necessarily applies because we remanded in *Briner*; but that argument ignores our specific remand language: "We reverse the grant of summary judgment on this claim. We leave for the district court, upon remand, to determine whether the intra-corporate conspiracy doctrine, first raised by defendants on appeal, may be invoked as a defense, or whether, as the Briners claim, the doctrine is inapplicable to § 1983 actions." *Briner v. City of Ontario*, 370 F. App'x 682, 707 (6th Cir. 2010) (citations omitted, but citing *Kinkus* for the latter proposition). The district court was correct in its assessment of the state of the law. *See Tinney v. Richland Cnty.*, No. 1:14-cv-703, 2015 WL 542415, *12 (N.D. Ohio, Feb. 10, 2015) (citing the lack of authority).

As for the exception, Mayor DiFilippo argues that if he was acting outside the scope of his employment, then he was necessarily engaged in a "random and unauthorized" act to which the *Parratt* doctrine must apply (thus defeating the due process claim). But DiFilippo confuses his self-serving intent to obtain DiLuzio's property, which was outside his scope of employment,

with his act of ordering the building demolished without predeprivation process, which was and only could have been completed under the authority of his employment.  That is, DiFilippo's exercise of his authority as Mayor to invoke Ohio Revised Code § 715.26(B) demonstrates that he was not engaged in a "random and unauthorized" act, whereas the improper abuse of that authority for personal gain or malicious intent was outside of the scope of his employment.

Thus, as the court held in *Briner*, 2010 WL 3982755 at *14, even if the intracorporate conspiracy doctrine applies to municipal government officials in a § 1983 action (and we do not here hold that it necessarily does), the doctrine does not apply in this case because the defendants are accused of conspiring to wrongfully divest DiLuzio of his property, which would fall outside the scope of their employment.  These defendants cannot invoke this defense.

We also conclude that Mayor DiFilippo is not entitled to state law immunity under Ohio Revised Code § 2744.03(A), which specifically excepts acts done "with malicious purpose, in bad faith, or in a wanton or reckless manner," § 2744.03(A)(6)(b).  In Ohio, for purposes of this provision, "'[b]ad faith' involves a dishonest purpose, conscious wrongdoing, the breach of a known duty through some ulterior motive or ill will, as in the nature of fraud, or an actual intent to mislead or deceive another."  *Cook*, 658 N.E.2d at 821.  As the district court determined, a jury could reasonably find from DiLuzio's record evidence that DiFilippo acted in bad faith.

**Fire Chief Kevin Klubert**

DiLuzio says Fire Chief Kevin Klubert engaged in the same misconduct as, and conspired with, Mayor DiFilippo in that he too knew that there was actually no dangerous condition but desired to demolish the building and coerce DiLuzio to sell the property, so he lied that an emergency dangerous condition necessitated quick action as a pretext for proceeding immediately with the partial demolition, before DiLuzio could stop him via predeprivation process.  Chief Klubert raises the same factual and legal arguments raised by Mayor DiFilippo and, given DiLuzio's record-supported evidence and our determination of the governing law, Chief Klubert's claims for qualified and state law immunity fail for the same reasons.

**Village of Yorkville**

DiLuzio says the Village of Yorkville is responsible for the decisions of its policymakers who hold "final and unreviewable" authority, *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993), namely, Mayor DiFilippo and Fire Chief Klubert (and, presumably, Police Chief Morelli). The Village acknowledges that DiFilippo and Klubert are final decision-makers authorized to bind the Village, but argues that they committed no constitutional violation. Given the foregoing determination that DiLuzio has sufficient record evidence to support a jury's finding of a constitutional violation, this claim fails at this summary judgment stage.

**State Law Claims and Pendant Appellate Jurisdiction**

DiLuzio charged DiFilippo, Klubert, and the Village with certain state law claims, including wrongful demolition and state law civil conspiracy, and the district court denied summary judgment on those claims. Even though these are not qualified immunity claims and, therefore, not final for purposes of appellate jurisdiction, the defendants press these claims on appeal and urge us to decide them under the authority of our pendant appellate jurisdiction.

"Pendent appellate jurisdiction *may* be exercised only when the immunity issues absolutely cannot be resolved without addressing the nonappealable collateral issues." *Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 752 (6th Cir. 2015) (editorial marks omitted). As has been demonstrated, that is not the case here, inasmuch as we have resolved all of the immunity issues without consideration of any of these collateral state-law-claim issues. Consequently, we do not have authority to extend pendant appellate jurisdiction to these issues.

**III.**

For the foregoing reasons, we AFFIRM the judgment of the district court.