NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0525n.06
No. 15-1870

**FILED**
Sep 09, 2016
DEBORAH S. HUNT, Clerk

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| WILLIAM JENNINGS, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| PATRICK FULLER, et al., | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendants-Appellants. | ) | |
| | ) | |

**BEFORE: SILER, BATCHELDER, and GIBBONS, Circuit Judges.**

**ALICE M. BATCHELDER, Circuit Judge.** When William Jennings briefly removed his left hand from the wall during a booking-room pat down at the Genesee County jail, the officer—a man literally twice his size—smashed him against a concrete wall, slammed him onto a metal bench, and then pinned him to the ground. As a result of that takedown, as well as the nine-minute struggle that ensued, Jennings suffered a trauma-induced cataract in one eye, a torn rotator-cuff, broken facial bones, nerve damage in one of his hands, and a chipped tooth. After charges against him stemming from the altercation were dropped, he sued six of the police officers involved under 42 U.S.C. § 1983, alleging that they had violated his right to be free from unreasonable searches and seizures, from excessive force, from false arrest, and from malicious prosecution. The officers moved for summary judgment. The district court denied that motion,

concluding that the officers were not protected by qualified immunity, and the officers filed this interlocutory appeal.

Qualified immunity is immunity from suit, not merely from liability. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Thus, while a denial of summary judgment isn't usually an immediately appealable final order, "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is." *Id.* at 530; *see also* 28 U.S.C. § 1291. Further, when a party files an interlocutory appeal, the district court is generally divested of jurisdiction, putting the underlying case on pause while the appeal is being resolved. *See Lewis v. Alexander*, 987 F.2d 392, 394 (6th Cir. 1993). Here, however, the district court took the unusual step of proceeding apace after concluding that the appeal was frivolous, stating that, because it "made clear that it [denied the motion for summary judgment] because of factual disputes in the record . . . . it firmly believe[d] that . . . the appeal d[id] not present a pure legal issue" and that we would therefore dismiss this appeal for want of jurisdiction.

This conclusion was only half right, and not for the reasons the district court expressed. With respect to the excessive force claim, it is true that there are disputed facts in the record, and that "we may not decide a challenge directly to the district court's determination of the record-supported evidence or the inferences it has drawn therefrom." *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 610 (6th Cir. 2015). Nevertheless, "we may decide a challenge [to a denial of qualified immunity] with any legal aspect to it, no matter that it might encroach on the district court's fact-based determinations." *Id.*

Here, the heart of the dispute regarding excessive force is not about whose version of events to believe, but about whether Jennings's version, insofar as it is not contradicted by video

evidence of the altercation, satisfies the standard for denying qualified immunity. That is a legal question. *See id.* at 609. And we therefore have jurisdiction over that portion of this appeal. *Id.*

We do not, however, have jurisdiction over the dispute regarding Jennings's malicious-prosecution claim because the officers did not argue before the district court that they were protected by qualified immunity on that point, but only that Jennings was collaterally estopped from pursuing his claim that the charges stemming from the altercation amounted to malicious prosecution. The district court's ruling on this issue appears to have viewed the officers' argument as relating to the arrest and prosecution for the underlying offense of drunk driving that landed Jennings in the booking room, not the subsequent proceedings for resisting law enforcement arising from the jailhouse altercation. This confusion notwithstanding, the district court's analysis of this claim was based on *res judiciata* and collateral estoppel, not qualified immunity. By failing to raise a qualified immunity defense on this issue, the officers not only waived that argument, *see Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008), but they also insulated the district court's decision on this point from interlocutory appellate review because we have no jurisdiction over a simple denial of summary judgment, *see* 28 U.S.C. § 1291.

There is thus only one merits question for us to consider: are the officers entitled to qualified immunity on the excessive force claim? We pursue two lines of inquiry in answering this question: (1) Did the conduct violate a constitutional or statutory right? And (2), was that right clearly established at the time? *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013).

The right at issue here is guaranteed by the Fourth Amendment, which protects people "against unreasonable searches and seizures." U.S. Const. amend. IV. Courts have distilled

from this the principle that the means of a seizure must be "objectively reasonable." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Thus, our analysis may not consider the official's motives, only his actions. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004). It is nevertheless an extremely fact-dependent inquiry "not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). The Supreme Court has therefore instructed us to consider "the totality of the circumstances," paying particular attention to the "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Here, the "totality of the circumstances"—taken in the light most favorable to Jennings—are straightforward enough. Genesee County Police began looking for him after one of his neighbors—a disgruntled former roommate—told police that the two had gotten into a dispute and that he believed that Jennings had been smoking crack and had discharged a handgun. Police found Jennings shortly thereafter while conducting a traffic stop. Jennings, who said he was out driving to look for his dog that had gone missing, demonstrated all the typical signs of drunkenness, and a breathalyzer test showed that he had a BAC of 0.12%, well over the legal limit.[1]

The arrest was uneventful, as was the trip to the county jail. Once they arrived, the arresting officer (who is not a party to this case) took Jennings into the jail's booking room, where the ensuing activity was largely captured on videotape. The recording begins with Jennings sitting peacefully on a bench in the booking room. After a few minutes, Officer Fuller, one of the defendants in this case, has Jennings stand up and put his hands against the wall. Fuller, who is about twice Jennings's size (290 pounds vs. 140 pounds), then begins to pat him

---

[1] Jennings denied being high on drugs, however, which was confirmed by a later drug test.

down.  He eventually pats down Jennings's crotch area, and Jennings briefly and non-aggressively lowers his arm, apparently violating a prior verbal command to keep his hands on the wall.  Immediately, Fuller slams Jennings forward into the wall and Jennings (probably involuntarily, due to the shove) turns his head to the right, toward Fuller, but keeps his hands on the wall.  Fuller and a second policeman, Defendant Officer Kenamer, promptly and forcibly tackle Jennings, first to the metal bench on which Jennings had been sitting, and then to the floor.

Jennings cries out that he has emphysema and cannot breathe, and begins to struggle.  Several more officers come in, holding him down and spraying him in the face with pepper spray.  Despite being told to stop resisting, Jennings keeps fighting back for about nine minutes.  Throughout those nine minutes, the officers subject Jennings to all sorts of rough handling.  One officer appears to put his knee on Jennings's head/neck/shoulder area.  Another puts his hand over Jennings's mouth, apparently to keep him from spitting.  Jennings bites the hand that was smothering him, prompting the officers to put a "spit hood" over his head.  At one point, they have him pinned down and quite still on a concrete slab in a "safety cell."  This interlude lasts for only a minute or so before the officers decide to move him into a restraint chair.  That effort is unsuccessful.  An officer eventually uses a Taser on Jennings's lower back.  Finally, they secure him with straps, face down, on a restraint bed, where they leave him unattended—with the exception of an unidentified person who comes to the cell door to tell him "you're going to die"—for some three hours.  The officers never wipe off the pepper spray or remove the blood-soaked spit-hood.  In his deposition, Jennings testified that while tied down on the bed, he had so much trouble breathing that he passed out several times and that he eventually chewed a hole in the hood so that he could get enough air, chipping a tooth in the process.

Does this version of the facts rise to the level of a clearly established constitutional violation? We believe that it does. As the video makes clear, the initial takedown was a gross overreaction. Drunk driving is not a severe crime, nor, prior to the takedown, was there any indication that Jennings—who, recall, was half Officer Fuller's size—posed a threat to anyone. A jury could easily conclude that his lowering of his left hand was not an act of aggression.

Of course, takedowns are in many circumstances appropriate, *see Hayden v. Green*, 640 F.3d 150, 154 (6th Cir. 2011), but not always, *see Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006). The key point in the analysis is whether there was some real form of resistance or danger. *See Hayden*, 640 F.3d at 154; *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). Neither is present here. Under these circumstances, briefly and non-threateningly lowering a hand contrary to an instruction simply does not justify a forceful takedown. We think no reasonable officer would disagree.

Nor do we believe that any reasonable officer would tie someone like Jennings face-down for three hours on a restraint bed, especially having never removed the blood-soaked spit hood, never washed away the pepper spray, and never seen to it that Jennings received adequate medical attention even though he had screamed that he had trouble breathing and had emphysema. Not only was this experience very uncomfortable for Jennings, but, more troublingly, it also greatly impeded his ability to breathe, causing him to lose consciousness several times. Leaving a suspect in a situation where he will likely be asphyxiated may be objectively unreasonable. Indeed, it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Champion*, 380 F.3d at 903. A jury looking at the video could readily conclude that the straps that the officers' used to restrain

Jennings put significant pressure on his back. And the officers are therefore not entitled to qualified immunity on this point.

What of the other parts of the incident? Contrary to the district court's analysis, which relied heavily—and inappropriately, *see Cass v. City of Dayton,* 770 F.3d 368, 377 (6th Cir. 2014)—on the fact that the officers' actions violated department policies, there is some merit to their contention that, between the takedown (which involved only Officers Kenamer and Fuller) and the officers' tying Jennings to the restraint bed, their actions were not objectively unreasonable: whatever had led up to the takedown, the officers were faced with a suspect who was actively resisting, and they had to do something about it. The decision to restrain Jennings at that point was not constitutionally impermissible, and it is quite true that pepper spray, Tasers, arm bars, restraint devices, spit hoods, etc. all have their legitimate place. *See, e.g.*, *Lindsay v. Bogle*, 92 F. App'x 165, 169 (6th Cir. 2004) (unpublished); *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012); *see Kennedy v. Doyle*, 37 F. App'x 755, 757 (6th Cir. 2002) (unpublished). Further, as the officers point out, we analyze excessive force claims temporal segment by temporal segment. *See Claybrook v. Birchwell*, 274 F.3d 1098, 1104 (6th Cir. 2001). Thus, the fact that the initial takedown was clearly unconstitutional does not mean that all the officers' subsequent actions are *ipso facto* not protected by qualified immunity.

In another circumstance, the officers might have a winning point. But after carefully reviewing the video evidence, we conclude that we cannot neatly separate the objectively reasonable wheat from the clearly unconstitutional chaff—the officers' actions and decisions fit together into a single, fluid incident that began and ended with what a reasonable jury could easily conclude were violations of Jennings's clearly established constitutional rights. A jury, not a court, will be better situated to disentangle what was and what was not excessive force.

We therefore affirm the district court's decision to deny the officers' request for qualified immunity and remand for further proceedings; as explained above, we dismiss this appeal with respect to the malicious-prosecution claim because we have no jurisdiction over that matter.