*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0314p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

HIDDEN VILLAGE, LLC,

          *Plaintiff - Appellee*,

     *v.*

CITY OF LAKEWOOD, OHIO; THOMAS J. GEORGE; CHARLES E. BARRETT; EDWARD E. FITZGERALD,

          *Defendants-Appellants*.

No. 12-3543

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:10-cv-00887—Benita Y. Pearson, District Judge.

Argued: October 8, 2013

Decided and Filed:  October 30, 2013

Before:  KEITH and SUTTON, Circuit Judges; BLACK, District Judge.[*]

_____

## COUNSEL

**ARGUED:** James A. Climer, MAZANEC, RASKIN & RYDER CO., L.P.A., Cleveland, Ohio, for Appellants.  Richard C. Haber, HABER POLK KABAT, LLP, Cleveland, Ohio, for Appellee.  **ON BRIEF:** James A. Climer, Frank H. Scialdone, John D. Pinzone, MAZANEC, RASKIN & RYDER, CO., L.P.A., Cleveland, Ohio, for Appellants.  Richard C. Haber, HABER POLK KABAT, LLP, Cleveland, Ohio, for Appellee.

_____

[*] The Honorable Timothy S. Black, United States District Judge for the Southern District of Ohio, sitting by designation.

1

———————————

**OPINION**

———————————

SUTTON, Circuit Judge. Hidden Village owns an apartment complex in the City of Lakewood. It sued the city and its officials, alleging they waged a racially motivated campaign of harassment aimed at driving out some of its black tenants. The district court denied the defendants' motion for summary judgment. We conclude that most of Hidden Village's claims may proceed to trial.

I.

Lutheran Metropolitan Ministries runs the Youth Re-Entry Program, a service that helps young people released from foster care or juvenile detention re-enter society. The program prepares its clients to live on their own by among other things teaching them how to apply for a job or to find an apartment. Approximately four-fifths of the program's members are black.

In 2006, the program moved from its original home in a Cleveland neighborhood to the suburb of Lakewood, where it planned to house its clients in apartments leased from Hidden Village. Before moving in, program leaders met with city officials in February to explain their mission. At the meeting, Lakewood's Building Commissioner Charles Barrett objected that the program's location violated local zoning laws. In the program's view, the tenancy amounted to a permitted residential use; in Barrett's view, it was a prohibited institutional use. After seeking legal advice, the program moved into Hidden Village in April. Barrett responded by ordering the program's removal. The Lakewood Planning Commission unanimously reversed that decision on appeal.

That, alas, did not the end the controversy. In October, the police department sent officers a memo informing them that "[c]itations and arrests are the preferred course of action for violations encountered . . . in the vicinity of [Hidden Village]." R. 52-17. Program participants soon began complaining about police harassment. In one incident, two participants "were given tickets for jaywalking and astronomical fines for it." R. 54-

1 at 20–21.  In another, police stopped a participant for failure to attach a license plate to his bicycle.  In yet another, police falsely accused a program official of helping clients deal drugs.  Police also repeatedly cited (and eventually threatened to arrest) participants for walking on railroad tracks near Hidden Village.  Then, in February of the next year, Lakewood mayor Thomas George wrote to Lutheran Metropolitan Ministries: "I will seek to have the program removed from Lakewood at the earliest possible time."  R. 52-24 at 2.

In May 2007, a team of Lakewood officials—police, an officer in SWAT attire, a canine unit, fire department workers, health department workers—visited Hidden Village, unannounced and without a search warrant, for the purpose of conducting what the defendants term a "joint inspection."  The visit left residents "intimidated" and "afraid."  R. 52-4 at 16.  Another visit from a fire inspector followed a week later.

Perceiving a pattern of intimidation based on the race of its tenants, Hidden Village sued Lakewood, Mayor George, Building Commissioner Barrett, and Housing and Building Department Administrator Edward Fitzgerald (who had directed a member of his department to participate in the joint inspection).  The Youth Re-Entry Program did not participate in the lawsuit.  The district court rejected the defendants' motion for summary judgment, holding along the way that the individual defendants did not enjoy qualified immunity.  This interlocutory appeal followed.

## II.

Hidden Village filed this lawsuit under § 1981, § 1982 and § 1983, claiming that the defendants discriminated against its tenants on account of race.  It also sued under the Fair Housing Act, claiming that the defendants retaliated against it for helping the tenants exercise their fair housing rights.  George, Fitzgerald and Barrett respond to all of these federal claims by asserting qualified immunity, a defense that shields public officials from liability and trial unless (1) their conduct violates a constitutional or statutory right and (2) the right was clearly established when the conduct occurred.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Lakewood is not eligible for qualified immunity because it is a city, not an individual.  But liability against the city arises only

if it violated a constitutional or statutory right through a custom or practice of doing so. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–92 (1978). Hidden Village also raised a state law claim. The joint inspection of the premises, it alleged, amounted to a trespass. The individual defendants respond by claiming that they enjoy state immunity, *see* Ohio Rev. Code § 2744.03, and a privilege to inspect the property.

A.

Before umpiring these debates, we must ensure our authority to do so. As a general rule, a litigant must wait until the district court finally disposes of a case before he may appeal. 28 U.S.C. § 1291. Notwithstanding that rule, a party may obtain appellate review of a small set of collateral orders—conclusive rulings separate from the merits of the case that effectively would be unreviewable if the appeal came after the trial. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). Once the collateral order doctrine brings some claims into an appellate court, the doctrine of pendent appellate jurisdiction allows other "inextricably intertwined" claims to tag along. *Chambers v. Ohio Dep't of Human Servs.*, 145 F.3d 793, 797 (6th Cir. 1998).

The collateral order doctrine secures our jurisdiction over George, Fitzgerald and Barrett's appeal concerning their liability under the federal civil rights statutes. All three sought, and all three were denied, qualified immunity. Because official immunity is not just a defense to liability but a defense to standing trial, a denial of immunity is a collateral order subject to immediate appeal. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

That conclusion leads to another—that we have pendent appellate jurisdiction over Lakewood's appeal. The city raised two defenses in the trial court: (1) that no statutory or constitutional violation occurred, and (2) that, if one did occur, it did not result from a municipal custom or policy. But the city wisely raises only the first defense in this appeal. Whether a violation occurred is inextricably intertwined with, indeed duplicates the first step of, the individual defendants' qualified immunity defense. *Mattox v. City of Forest Park*, 183 F.3d 515, 524–25 (6th Cir. 1999). Whether a

municipal policy authorized any violation is not. *Swint v. Chambers County Comm'n*, 514 U.S. 35, 51 (1995).

That leaves the state-immunity and privilege defenses to the trespass claim. The denial of a state defense is immediately appealable if state law regards the defense as an exemption from being sued, not merely as an exemption from liability. *Chesher v. Neyer*, 477 F.3d 784, 793 (6th Cir. 2007). Immunity under Ohio Rev. Code § 2744.03, like federal-official immunity, is an exemption from suit, and our interlocutory jurisdiction as a result reaches the district court's rejection of this defense. *Id.* at 793–94.

Privilege turns out to be another matter. "Privilege" is an umbrella term for a variety of common-law defenses (sometimes codified by statute) to a trespass action. *See, e.g.*, *Ploof v. Putnam*, 71 A. 188 (Vt. 1908) (private necessity); *Campbell v. Race*, 61 Mass. 408 (1851) (deviation from an obstructed public highway); *Great Falls Co. v. Worster*, 15 N.H. 412 (1844) (entry to abate a nuisance). The defendants claim privilege on the theory that they entered Hidden Village's property to inspect it. But privilege has traditionally been regarded as a shield against trespass *liability*. The defendants do not cite, and we have not found, any authority suggesting that Ohio has elevated privilege into an immunity from a trespass *lawsuit*. It follows that the district court's denial of the defendants' claim of privilege is not eligible for expedited appellate consideration under the collateral order doctrine. Nor does pendent appellate jurisdiction come to the rescue. Far from being inextricably intertwined with any other claim or defense, the privilege defense raises its own legal and factual issues. *See Turi v. Main St. Adoption Servs., LLP*, 633 F.3d 496, 503 (6th Cir. 2011).

We thus may review the appeals from the district court's denial of summary judgment under § 1981, § 1982, § 1983 and the Fair Housing Act. And we may review the district court's rejection of the immunity defense to the trespass claim, though not its rejection of the privilege defense.

B.

The main dispute in this appeal concerns the facts: George, Fitzgerald and Barrett say they did not discriminate on the basis of race; Hidden Village says they did. Race discrimination, the parties agree, is an indispensable element of each of the federal claims raised by Hidden Village, putting this question at the front and center of the appeal.

Because the case arrives here on the defendants' motion for summary judgment, we need decide only whether Hidden Village has produced evidence from which a jury could reasonably conclude that they discriminated on the basis of race. It has. A jury could reasonably infer (1) a concerted attempt to drive the Youth Re-Entry Program out of Hidden Village (2) involving all three defendants (3) on the basis of the program members' race.

*One*, considerable evidence shows a concerted effort to displace the program. Hidden Village and the program endured a series of unfavorable actions—the initial decision that the program had violated the zoning laws, harassment by the police, a letter from the mayor warning the program to leave—followed by two inspections after it decided to stay. While all this happened, city officials regularly communicated with each other about how best to encourage the program's departure. Consider this email from Mayor George to city officials: "[L]et me be clear as to the Administration's policy. . . . [T]he Administration opposes the [Hidden Village] location." R. 52-11. Consider this email from an advisor to the mayor a few months after the city's loss before the Planning Commission: "Ed Fitzgerald thinks he has a new, untried zoning angle for our problem." R. 52-23. And consider the meeting notes suggesting that city officials discussed methods to bring about the program's removal, ranging from "go[ing] back to [the Planning Commission]" to applying "nuisance laws" to invoking "fire safety." R. 52-28. On this record, it takes little to infer a common plan of action.

*Two*, a jury could reasonably conclude that all three defendants—George, Fitzgerald and Barrett—participated in the effort to drive the program out of Hidden

Village.  As for Mayor George:  He sent city officials an email announcing that his administration had a policy of opposing the program's Hidden Village location.  He later sent Lutheran Metropolitan Ministries a letter warning, "I will seek to have the program removed from Lakewood at the earliest possible time."  R. 52-24 at 2.  As for Fitzgerald:  An email from an advisor, as just noted, informed the mayor that Fitzgerald was coming up with a "new, untried . . . angle for [the Hidden Village] problem."  R. 52-23.  The email explained that Fitzgerald wanted "to run it by" the administration "in time for the next meeting."  *Id.*  Fitzgerald also directed one of his subordinates to participate in the joint inspection of Hidden Village's property.  As for Barrett:  He made the initial zoning order against the program.  As for all three of them:  They all participated in a meeting at which officials discussed strategies to remove the program from Lakewood, even after the program received the Planning Commission's seal of approval.

*Three*, a jury could conclude that race discrimination motivated George, Fitzgerald and Barrett.  The record suggests that city officials repeatedly singled out the Youth Re-Entry Program for unfavorable treatment.  A police department memo, for example, instructs officers to target program members for arrests:  "The only way we can document that we are having problems with [program members] is to record their information. . . . Citations and arrests are the preferred course of action for any violations encountered on or off site, in the vicinity of [Hidden Village.]"  R. 52-17.  Police soon began citing participants for violating rules about jaywalking, walking on the railroad tracks and riding bicycles without license plates—rules that the City never before enforced with such vigor.

So also a jury could conclude that the joint inspection involved disparate treatment of the program.  For starters, Lakewood typically conducts joint inspections only when there is some reason to do so—say when the building changes its fire safety system, or when residents complain about housing code violations.  But when asked why the joint inspection of Hidden Village occurred, the city's fire inspector responded, "I don't recall a specific reason being given for Hidden Village."  R. 46-1 at 31–32.  Even when a joint inspection occurs, moreover, the city normally informs the owner

beforehand. But city officials gave no forewarning in this case. And when the inspectors arrived, they skipped Hidden Village buildings occupied by other tenants and concentrated on buildings occupied by the program. To top it all off, the inspectors, contrary to protocol, asked residents to leave the building while the inspection took place.

It is bad enough that Lakewood officials targeted a predominantly black organization in general. But worse, a jury could conclude that the officials targeted the organization's black members in particular. The program director testified that, although the program had white clients, none of them reported police harassment to her; all complaints of police harassment came from black clients. Another official from the Lutheran Metropolitan Ministry testified to the same effect.

More, some of the discussions among city officials centered on the program participants' race. Before the program moved into Hidden Village, Edward Favre, a close advisor to the mayor through whom "[a]ny policy from [the] Administration regarding this issue [was] directed," told Barrett "that there were a lot of blacks in the program." R. 52-6 at 4; R. 52-21 at 1. And Charles Barrett admitted in his deposition, "I know there was a concern about [the program], about what type of people would be in there." R. 41-1 at 23. Perhaps, as Barrett later suggested, "type of people" meant former juvenile offenders rather than black people, *see* R. 41-1 at 23–24, but a jury might not see it that way in the context of the other evidence.

In view of this evidence of race discrimination, a jury could reasonably disbelieve the defendants' alternative explanations for their conduct. The defendants say they were motivated by a sincere zeal to enforce the zoning laws, but a jury might think otherwise because the defendants continued their campaign against the program long after the Planning Commission's grant of zoning approval. The defendants also say they wanted to expel the program from Lakewood because it spawned a crime wave in the area, but there remains a genuine dispute about whether there was any basis for believing that an increase in crime occurred and if so whether the program contributed to it. The record, indeed, reflects efforts by city officials to create the appearance of a crime wave.

The individual defendants in short cannot obtain summary judgment on the ground that they never acted on account of race. The evidence permits a contrary conclusion, as the district court correctly held.

C.

Moving from the facts to the law, the defendants raise a variety of qualified-immunity arguments with respect to Hidden Village's claims under §§ 1981–1983, the Fair Housing Act and Ohio trespass law.

*§§ 1981–1983.* Section 1981 guarantees "[a]ll persons . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," and defines the making and enforcement of contracts to include "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981. Section 1982 guarantees "[a]ll citizens . . . the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." *Id.* § 1982. And § 1983 makes state actors liable for violating federal constitutional rights, including those protected by the Fourteenth Amendment. *Id.* § 1983.

In debating whether Hidden Village has the right to go to a jury on these claims, the parties on appeal mainly have debated whether the central predicate for each claim—whether the defendants engaged in race discrimination—existed. As just shown, there is sufficient evidence of race discrimination to permit Hidden Village to present these claims to a jury.

That leaves the question whether Hidden Village is the proper plaintiff when it comes to each claim. It is easy to see how these provisions would allow a tenant who experienced race discrimination to sue. But the claimant in this case is Hidden Village; the Youth Re-Entry Program and its members never joined the lawsuit. The issue is whether a landlord may sue to vindicate its tenants' anti-discrimination rights given "the prudential standing rule that normally bars litigants from asserting the rights or legal

interests of others in order to obtain relief from injury to themselves." *Warth v. Seldin*, 422 U.S. 490, 509 (1975).

With respect to the § 1983 claim, we need not resolve the question of third-party standing. The Fourteenth Amendment contains not only an Equal Protection Clause that protects tenants against arbitrary discrimination but also a Due Process Clause that protects landlords against irrational restrictions upon how they use their property. *See, e.g.*, *Arlington Heights*, 429 U.S. at 263; *Moore v. East Cleveland*, 431 U.S. 494, 513 (1977) (Stevens, J., concurring in the judgment). Rationality may be a low bar. But the government flunks even that test when it tries to prevent a landlord of any race from renting to tenants based on their race.

*Buchanan v. Warley* illustrates the point. 245 U.S. 60 (1917). Buchanan, a white homeowner, challenged a Louisville ordinance that prohibited black people from living in his neighborhood. The Supreme Court rejected the claim that Buchanan could not sue because the ordinance violated only the constitutional rights of black people. *Id.* at 72. Rather, the ordinance transgressed "the constitutional right" of property owners "to sell [their] property to a colored man." *Id.* at 75. The ordinance was thus "in direct violation of the fundamental law . . . preventing state interference with property rights except by due process of law." *Id.* at 82. At oral argument in our case, the defendants' lawyer conceded that *Buchanan* allows a landlord to sue a city for violating his constitutional property rights if it tries to drive out his tenants because of their race. As to the § 1983 claim, any potential problem with third-party standing thus has evaporated.

The same is true with respect to the § 1981 and § 1982 claims, but for a different reason. Despite raising this issue below and despite making some arguments on this score in their initial brief, the defendants have opted not to pursue a third-party defense with respect to the §§ 1981 and 1982 claims on this interlocutory appeal. In a supplemental brief requested by the court, the defendants assured us that in this appeal they do not challenge Hidden Village's standing to bring these two claims. Appellants' Supp. Br. at 2. The defendants' lawyer repeated this assurance at oral argument. Hidden Village may continue with its claims under §§ 1981–1983 against all defendants.

*Fair Housing Act.* Enacted in 1968 to stamp out discrimination in the housing market, the Fair Housing Act makes it illegal "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617. Those sections in turn prohibit various forms of discrimination relating to housing, including "mak[ing] unavailable or deny[ing] a dwelling to any person because of race" and "discriminat[ing] against any person in the terms, conditions, or privileges of sale or rental of a dwelling . . . because of race." *Id.* § 3604. Hidden Village claims that it helped its tenants exercise their fair housing rights, and that the defendants responded by coercing, intimidating, threatening or interfering with it in violation of § 3617. Hidden Village does not contend that the defendants ever violated the underlying housing rights protected by §§ 3603–3606.

In response, the defendants argue that they may not be charged with violating § 3617 unless they separately violated at least one of the provisions in §§ 3603–3606. We disagree. Section 3617 nowhere says that it comes into play only when a violation of one of these other sections has also occurred. An example confirms the freestanding nature of some § 3617 claims. Suppose Alice says to Bob, a prospective home buyer, "If a seller ever discriminates against you because of your race, sue him!" Eve, a racist eavesdropper, becomes enraged upon hearing this conversation and threatens to assault Alice. At this point, Eve has violated § 3617, regardless of whether she discriminated against Bob or otherwise violated the fair housing rights secured by §§ 3603–3606. Eve has "threaten[ed] . . . [a] person," namely Alice. And this threat was "on account of [Alice's] having aided or encouraged any other person in the exercise or enjoyment of [a fair housing right]." Eve threatened Alice because Alice had encouraged Bob to protect himself against discrimination relating to housing. The statute requires no more.

That takes care of the city, and it also takes care of the first step of the individual defendants' claim to qualified immunity. To defeat the qualified immunity defense, however, Hidden Village must also show that precedents on the books when the

defendants acted (in 2006 and 2007) clearly established that their conduct violated § 3617 even though it violated nothing else in the Fair Housing Act.  That in turn requires pointing to either "controlling authority" or "a robust consensus of cases of persuasive authority."  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011).  Hidden Village does not have controlling authority on its side.  Until today, the Sixth Circuit has never held that a defendant can violate § 3617 without violating §§ 3603–3606.  To the contrary, we had left the question open.  *See Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 346 n.4 (6th Cir. 1994).

Nor was there a "consensus" of cases of "persuasive authority."  Just the opposite.  By 2007, the Fifth Circuit had held that a violation of §§ 3603–3606 is indispensable to a § 3617 claim.  *See McZeal v. Ocwen Fin. Corp.*, 252 F.3d 1355 (5th Cir. 2001) (unpublished).  The Seventh Circuit had twice reserved the question.  *South-Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors*, 935 F.2d 868, 886 (7th Cir. 1991); *MHDC v. Village of Arlington Heights*, 558 F.2d 1283, 1288 n.5 (7th Cir. 1977).  Another Seventh Circuit opinion implied that the defendants' interpretation was right.  *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004).  Hidden Village, meanwhile, does not identify a single federal appellate court decision that had clearly come out on its side of this debate.  The best we have found is dictum to that effect from the Ninth Circuit, *see Smith v. Stechel*, 510 F.2d 1162, 1164 (9th Cir. 1975), and a handful of decisions from district courts.  This state of affairs circa 2007 does not amount to the "robust consensus" that the qualified immunity test demands.

Hidden Village invokes *Bloch v. Frischholz*, which interpreted § 3617 as we do today.  587 F.3d 771, 781 (7th Cir. 2009) (en banc).  But that decision came out in 2009; it did not clearly establish anything in 2006 or 2007.  More telling is *Bloch*'s observation about the state of the law on whether liability under § 3617 depends on a violation of §§ 3603–3606:  "Courts are split on the issue."  *Id.* at 781.  In the final analysis, Hidden Village may carry on with its Fair Housing Act lawsuit against the city.  But the individual defendants are entitled to qualified immunity.

*Trespass.*  Hidden Village's trespass theory takes aim at George, Fitzgerald and Barrett for their role in arranging the joint inspection.  Ohio law shields any "employee of a political subdivision" from state-law claims, but it makes an exception to this blanket rule for "acts or omissions [done] with malicious purpose, in bad faith, or in a wanton or reckless manner."  Ohio Rev. Code § 2744.03(6)(b).   Although federal immunity law uses an objective test that looks at the state of the law at the time of the violation, Ohio immunity law thus uses a subjective test that looks at the officer's state of mind.

The individual defendants are not entitled to state immunity (at least at the summary judgment stage), because a jury reasonably could conclude that they acted with malicious purpose.  Under Ohio law, a public employee acts with malicious purpose if he "willfully and intentionally acts with a purpose to cause harm."  *Pritchard v. Hamilton Twp. Bd. of Trs.*, 424 F. App'x 492, 509 (6th Cir. 2011); *see also, e.g.*, *Cook v. Hubbard Exempted Village Bd. of Educ.*, 688 N.E.2d 1058, 1061 (Ohio App. 1996); *cf. Teramano v. Teramano*, 216 N.E. 2d 375, 377 (Ohio 1966) ("'Malicious' means 'indulging or exercising malice; harboring ill will or enmity.'").  Hidden Village does not allege that mere negligence (say a clerical mixup about which building to inspect) led Lakewood officials to enter its premises.  It alleges that the joint inspection was conducted with the purpose of harassing, intimidating and ultimately driving out its tenants—in other words, that it was done "willfully and intentionally . . . with a purpose to cause harm."  For reasons already explained, a jury could reasonably believe Hidden Village's version of events.  That suffices to deny summary judgment to the defendants.

Because the individual defendants are not entitled to state-law immunity, and because we lack jurisdiction to review the district court's rejection of the privilege defense, Hidden Village's trespass claim may continue to trial.

III.

For these reasons, we affirm the district court's judgment in part, reverse the judgment in part and decline jurisdiction over the appeal in part.