NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0306n.06

No. 20-3458

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| BOB POST, | ) | **FILED**<br>Jul 01, 2021<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CITY OF MUNROE FALLS, OHIO, JAMES | ) | COURT FOR THE |
| ARMSTRONG, JERRY HUGHES, and THOMAS | ) | NORTHERN DISTRICT OF |
| KOSTOFF, | ) | OHIO |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE:     BATCHELDER, GRIFFIN, and BUSH, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** Appellee Bob Post, a former City of Munroe Falls, Ohio, police sergeant, sued the City, Mayor James Armstrong, Police Chief Jerry Hughes, and Law Director Thomas Kostoff for First Amendment retaliation and various state-law claims after he was fired under disputed circumstances. The district court denied summary judgment to all defendants on Post's First Amendment claim, and to Armstrong and Hughes on his state-law defamation, malicious prosecution, and civil conspiracy claims. Armstrong, Hughes, and Kostoff ("Appellants") appeal the district court's denial of qualified and state statutory immunity. We AFFIRM in part and REVERSE in part.

### I. Jurisdiction

We begin with a brief discussion of our jurisdiction in this case, both because Post claims we have none and because the limits on our jurisdiction to review denials of summary judgment color how we state the facts of this case.

#### A. Denial of Qualified Immunity

"A district court's denial of qualified immunity is an appealable final decision . . . only to the extent that its decision turns on an issue of law." *See v. City of Elyria*, 502 F.3d 484, 489 (6th Cir. 2007) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). We may decide an appeal from the denial of qualified immunity so long as it is: (1) "an appeal challenging the district court's *legal* determination that the defendant's actions violated a constitutional right or that the right was clearly established"; (2) "an appeal challenging a *legal* aspect of the district court's factual determinations, such as whether the district court properly assessed the incontrovertible record evidence"; or (3) "as a *legal* question, an appeal challenging the district court's factual determination insofar as the challenge contests that determination as blatantly contradicted by the record, so that no reasonable jury could believe it." *DiLuzio v. Village of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015) (internal citations and quotation marks omitted).

"We may not, however, decide an appeal challenging the district court's determination of 'evidence sufficiency, *i.e.*, which facts a party may, or may not, be able to prove at trial.'" *Id.* (emphasis omitted) (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). "As a matter of practical application, . . . we may not decide a challenge directly to the district court's determination of the record-supported evidence or the inferences it has drawn therefrom, but we may decide a challenge with any legal aspect to it, no matter that it might encroach on the district court's fact-based determinations." *Id.* at 610. In doing so, we ignore any attempts by the appellant to dispute facts,

avoid making any factual findings, even by implication, and resolve the legal issue based on the plaintiff's version of the facts. *Id.* at 611; *Greve v. Bass*, 805 F. App'x 336, 337 (6th Cir. 2020). Therefore, we have jurisdiction to review any legal aspects of Appellants's qualified immunity claims.

**B.  Denial of Statutory Immunity**

We can review a district court's order denying statutory immunity under the collateral order doctrine "only if the state law provides immunity from suit, as opposed to immunity simply from liability." *Chesher v. Neyer*, 477 F.3d 784, 793 (6th Cir. 2007).  Ohio law "provides political officials and subdivisions with immunity from suit, and thus warrants interlocutory appellate jurisdiction under the collateral order doctrine." *Id.* at 794.  This doctrine allows us to look only at whether Post alleged sufficient facts for a jury reasonably to conclude that each defendant acted with the kind of intent necessary to overcome Ohio's presumption of immunity. *See Hidden Vill., LLC v. City of Lakewood*, 734 F.3d 519, 529–30 (6th Cir. 2013).  We may review other aspects of the state-law claims in this case (notably, whether the record supports denial of summary judgment on the merits) only if they are inextricably intertwined with either the qualified or statutory immunity issue. *DiLuzio*, 796 F.3d at 616.  And, as with qualified immunity, we may review only legal questions and must accept Post's version of the facts. *Cf. Chesher*, 477 F.3d at 793.

## II.  Background

Post began working with the Munroe Falls Police Department in 1998 as an unpaid auxiliary officer and rose to become a part-time and then full-time patrol officer before joining the Department's command structure.  He was a sergeant upon his termination in 2018, and had minimal disciplinary history prior to the two disputes giving rise to this lawsuit: the Budget Dispute and the Home Owner's Association ("HOA") Dispute.

## A.  The Budget Dispute

The City of Munroe Falls has endured an ongoing debate over its reliance on part-time police officers.  The City's residents passed a tax levy in May 2017 that was, in part, represented to the voters as being designed to increase full-time police staffing.  But the first budget to include the levy money instead proposed expanding the City's part-time police force.  A Munroe Falls City Councilman asked Post to comment on the budget at the City Council meeting where it was introduced; Post declined.  After that meeting, Phil Keren, a reporter for the local *Stow Sentry* newspaper, contacted Post for comment.  In Keren's article, published on November 30, 2017, Post expressed his support for adding full-time police officers, his opposition to expanding the part-time police force, and his view that the levy was meant to increase full-time police staffing.

On December 3, in the police department parking lot, Post and Mayor Armstrong had a verbal altercation over the newspaper article.  Post and Armstrong each said the other was the aggressor (although the only material differences in the two stories are each man's tone and body language) and there were no other eyewitnesses.  The City suspended Post pending an investigation into the incident.  Both Armstrong and Police Chief Hughes proposed to City Council that they fire Post over the altercation.

Hughes and Kostoff, believing that Hughes could not be impartial, asked the Summit County, Ohio, Sheriff's Office to investigate the altercation.  The investigator interviewed Armstrong, Hughes, and Post.  Hughes, who had not witnessed the altercation, told a story that matched Armstrong's.  The Sheriff's Investigation Report, released on January 3, 2018, was unable to verify either man's story by a preponderance of the evidence.  On January 11, 2018, Hughes wrote a statement, intended as a response to the "constant beating [he felt he was taking] on Facebook [and] also, in the *Stow Sentry*," disagreeing with the report.  (R. 29, Dep. of Hughes, at

PageID# 205). Hughes concluded his statement by writing "[w]hile I truly appreciate the Summit County Sheriff's Office efforts on our behalf, I feel that I still must look at the totality of the circumstances and I will need to review these findings with our Law Director Tom Kostoff." (R. 29 ex. 5, Response to Sheriff's Investigation Report, at PageID## 471–72).

Post produced a declaration from a Munroe Falls City Councilman attesting that Hughes "issued" the statement. In his deposition for this lawsuit, Hughes testified that he did not recall whether he posted the statement on Facebook, sent it to the *Sentry*, or "just gave it to the mayor."

Post remained suspended after the Sheriff's Investigation ended, pending a return-to-work psychiatric evaluation.

**B. The HOA Dispute**

Contemporaneously with the Budget Dispute, Post was involved in an unrelated, ongoing dispute about the leadership of the HOA for the residential development where he lived. In October 2017, the HOA President angrily approached a resident who was distributing letters opposing him, and many HOA members feared the tension could result in violence. On November 27, 2017, another resident hosted a meeting at his house. Because some members feared violence, they asked Post, who was on duty as a police officer that evening, to attend. Post attended the meeting without reporting his location to police dispatch, stayed for three hours, and noted it on his police log.

Two days later, two residents needed to deliver a "Demand for a Special Meeting" to the HOA President. Post was a signatory to the Demand. On the advice of counsel, the two residents contacted the City Police Department to request that officers stand by during the delivery. The

Department dispatched Post (who was on duty that night)[1] and another officer who both stayed about 20–25 feet back from the HOA President's door while three residents delivered the Demand. The HOA President shouted at Post, but there is no evidence that Post acted unprofessionally. One of the residents later thanked Hughes for dispatching the officers, to which Hughes told her that Post was "just doing his job."

After finishing the assignment, Post completed field interview ("FI") cards for the people involved. At his deposition for this lawsuit, Post testified that, under a Police Department policy established by the Police Chief who preceded Hughes, "[i]f [an officer] make[s] contact with someone [during a call], then [they]'re required to do a report with an FI card." (R. 31, Dep. of Post, at PageID# 725). Post believed he was required to use Ohio's LEADS (Law Enforcement Automated Database System) server to complete FI cards; he had "always" used LEADS to complete the cards and had taught others to do the same. Post used his cruiser's mobile data terminal to search LEADS for the individuals present. He contacted police dispatch for assistance with finding information on the HOA President, whose common name prevented Post from finding him on the mobile data terminal. Post complained about the HOA President while on the phone with dispatch, telling the dispatcher that the HOA board "had gone rouge [sic], they changed our by-laws, we can not [sic] vote on anything, they can assess us. We are petitioning through an attorney so that we can vote them out." (R. 29 ex. 25, Pre-Disciplinary Hearing Report, at PageID# 536).

The next day (November 30—the same day the *Sentry* published the article with Post's comments), the HOA President went to Hughes's office, to complain about the interaction, saying

---

[1] Whether Post's dispatch was serendipitous or planned by Post and the residents remains disputed, although it is immaterial to this decision.

that he felt intimidated by Post. The HOA President left without making a formal complaint. A few weeks later, the HOA President returned to again complain about Post and allege that Post searched him in a law enforcement database. Hughes offered to investigate, and the HOA President filed a formal complaint.

## C. Hughes's Investigation of Post

Hughes eventually discovered that Post had searched the HOA President on LEADS.[2] City Law Director Kostoff instructed Hughes to work with Police Legal Advisor Tom DiCaudo. DiCaudo told Hughes that he thought Post had committed a fifth-degree felony LEADS violation under Ohio Revised Code Section 2913.04(C). After further investigation, DiCaudo, in the presence of Armstrong, Kostoff, and City Union Attorney Paul Jackson, instructed Hughes to file a criminal report. That report was provided to the prosecutor's office, and contained no mention of the former Chief's policy even though Post had immediately responded to the allegation by explaining that the policy required him to run LEADS searches when he was dispatched. Post was on suspension during this investigation because of the Budget Dispute and, against the advice of Police Legal Advisor DiCaudo, Hughes never interviewed Post for his investigation. He interviewed people who spoke in favor of Post only after a pre-disciplinary hearing recommended Post's firing.

The City took the unprecedented step of bringing in a third-party adjudicator to conduct a pre-disciplinary hearing. During the hearing, Post's union counsel "contend[ed] that Sgt. Post had to use the LEADS to get all the information required to complete his Field Interview Report." (R. 29 ex. 25, Pre-Disciplinary Hearing Report, at PageID# 536). Hughes was present at the

---

[2] The investigation does not mention when, or if, Hughes discovered that Post had run searches of the other individuals present. Hughes's investigation seemed either to ignore altogether Post's use of LEADS to search the other individuals, or to be ignorant of it.

meeting where this argument was made, and based his termination letter on the Pre-Disciplinary Hearing Report. The third-party adjudicator cleared Post of one of Munroe Falls's three charges (related to the delivery of papers to the HOA President), and recommended firing on the other two (attendance at the HOA meeting and running a LEADS search on the HOA President).

Hughes fired Post on April 3, 2018, citing Post's attendance at the November 27 HOA meeting and Post's use of LEADS to obtain information on the HOA President on November 29. In a termination letter, Hughes described the former as "minor" compared to the latter. Hughes also issued a press release on April 3 that reported the results of the pre-disciplinary hearing, accused Post of violating "City policy and Ohio law," and said that "[t]he case has been turned over to the Summit County Prosecutor's Office." (R. 31 ex. 13, Press Release, at PageID# 908).[3]

### D. Prior LEADS Violations in Munroe Falls

Hughes had handled one prior LEADS investigation since becoming the City's Police Chief. It involved two officers's using LEADS to find private information about a woman and then using that information to sexually harass her. One officer received a five-day unpaid suspension, the other a one-day unpaid suspension. At his deposition for this lawsuit, Hughes testified that he had wanted to fire the former officer and give the latter a long suspension but reduced the punishments after negotiating with the union. (R. 29, Dep. of Hughes, at PageID## 283, 285). Hughes referred neither officer for possible prosecution.

### E. The Criminal Case

In August 2018, an Ohio grand jury indicted Post for four counts of unauthorized use of LEADS pursuant to O.R.C. § 2913.04(C). Hughes testified at the grand jury proceeding but did

---

[3] We note that Appellants's telling of this case shares many elements with the facts underlying *Van Buren v. United States*, 141 S. Ct. 1648 (2021). But because *Van Buren*'s holding deals only with liability under the Computer Fraud and Abuse Act of 1986, we do not believe the decision to be relevant at this stage of this litigation. *Id.* at 1662.

not mention the existence of any Department policy covering the use of LEADS to create FI cards. At his deposition in this lawsuit, he claimed that he was unaware of the policy at the time. Hughes also testified at deposition that he had the pre-disciplinary report during the grand jury proceeding; that report mentions Post's argument that he had to use LEADS to complete the FI card.

Prosecutors dismissed the criminal charges in November 2018 after Hughes provided them with information about the FI card policy. In an interview with the *Sentry*, Hughes said that he learned of the policy in October when "one of his sergeants told him," and that he emailed the information to the prosecutors on October 15. Also on October 15, Hughes sent a Department-wide email instructing officers to stop following the FI card policy.

The City did not rehire Post following the dismissal of the criminal case. Post had sought recourse through the police union, but that process was stayed for the criminal proceedings and remains stayed pending the outcome of the present litigation. The State of Ohio currently bars Post from accessing LEADS, which limits his ability to work as a police officer. Post contends that Hughes has an ongoing role in blocking Post's use of the database.

**F. Procedural Background**

Post filed this lawsuit on December 5, 2018. The district court denied Appellants summary judgment on Post's First Amendment retaliation claim and denied Armstrong and Hughes summary judgment on Post's state-law claims; but it granted summary judgment to the City and Kostoff on Post's state-law claims. Appellants timely filed this interlocutory appeal of the denial of immunity.

### III. Analysis

Appellants raise claims of both qualified immunity and state-law statutory immunity. We AFFIRM the denial of qualified immunity, and we AFFIRM in part and REVERSE in part the denial of statutory immunity.

### A. Qualified Immunity

We review de novo whether the district court properly denied summary judgment on qualified-immunity grounds. *Kennedy v. City of Villa Hills*, 635 F.3d 210, 213 (6th Cir. 2011). "At the summary judgment stage, the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *DiLuzio*, 796 F.3d at 608. Post alleges that Appellants—Armstrong, Hughes, and Kostoff—each violated his First Amendment free-speech right by retaliating against him after he spoke to the *Sentry*.

"It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). "The determination whether a public employer has properly discharged an employee for engaging in speech requires 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees.'" *Id.* (alteration in original) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). And "[a]ll public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern." *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 580 (6th Cir. 1997). This first raises a threshold question: whether Post's *Sentry* quotes can "be fairly characterized as constituting speech on a matter of public concern." *Matulin v. Village of Lodi*, 862 F.2d 609, 612 (6th Cir. 1988) (internal quotation marks and citation omitted). If the answer is no, Post loses. *Connick*, 461 U.S. at 146. But if the

-10-

speech was on a matter of public concern, we turn to the *Pickering* balancing test, which "requires that we balance [Post's] interest in making [his] statement against the interest of the [City Police Department], as an employer, in promoting the efficiency of the public services it performs through its employees." *See Rankin*, 483 U.S. at 388 (internal quotation marks and citation omitted). "The State bears a burden of justifying the discharge on legitimate grounds." *Id.* And we "must determine whether [Post]'s speech was a substantial or motivating factor in the employer's decision to take the adverse employment action." *See Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003). When performing this balancing, we must consider the manner, place, and time of the speech and the context of the dispute. *Rankin*, 483 U.S. at 388.

We begin by boiling down what is actually at issue. As the district court noted, Appellants expressly conceded that, if they fired Post for his constitutionally protected speech, they violated his First Amendment rights. (R. 43, Order Den. Summ. J., at PageID# 1197 (citing R. 33-1, Mem. in Supp. of Summ. J., at PageID# 1007)). Appellants have impliedly conceded that point here; they failed to argue in their briefing that Post spoke as a public official rather than a private citizen, that Post's speech was not on a matter of public concern, that the *Pickering* balancing test would weigh in favor of the City, or even that firing a public official for speaking in his private capacity to a newspaper reporter about an issue of public concern does not violate clearly established law.[4] Rather, Appellants rely on two arguments: that they fired Post purely for his LEADS violation and his improper actions related to the HOA dispute (so his speech had nothing to do with his firing),

---

[4] Taking all of Post's allegations as true—including his claim that he would not have been fired for the LEADS violation but for his quotes in the *Sentry*—he has alleged a violation of his clearly established constitutional rights. *See Rankin*, 483 U.S. at 384 ("It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech"); *Chappel*, 131 F.3d at 574 ("All public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern"); *Matulin*, 862 F.2d at 610–12 (holding that city officials violated a police officer's First Amendment rights by firing her for her comments made in response to a newspaper reporter's inquiry on a matter of public concern).

and, alternatively, that whether they fired Post for his speech does not matter because they would have fired him for his LEADS violation anyway.

Neither argument allows us to reverse the judgment of the district court. The former argument is an improper attempt to dispute facts. The district court held that there was sufficient evidence to create a genuine issue of material fact as to whether Appellants fired Post purely for the LEADS violation (as Appellants claim), or whether the LEADS violation was pretextual (as Post claims). We cannot disturb that holding. *DiLuzio*, 796 F.3d at 610; *See*, 502 F.3d at 490.

Appellants base their latter argument on the proposition that "[i]f [a] defendant can show that he would have taken the same action in the absence of [a] protected activity, he is entitled to prevail on summary judgment," regardless of whether the protected activity motivated the adverse action. *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (citation omitted). This means, say Appellants, that Post needed to present caselaw clearly establishing that the City could not fire Post for a LEADS violation,[5] or at least that it could not fire Post for a LEADS violation when he had previously engaged in controversial protected speech. But this argument runs into factual disputes too. Post presented a significant amount of evidence calling into question Appellants's claim that he would have been fired for his actions regardless of his interview with the *Sentry*, including evidence that prior LEADS violations resulted in significantly lower punishments for the violators (and no referral for prosecution) and that the LEADS investigation omitted evidence that directly contradicted its conclusion that the purpose for Post's use of LEADS was to search an adversary (namely evidence that he also searched his alleged allies). The district

---

[5] A high bar, since firing someone for misusing LEADS does not implicate the Constitution save for a possible claim of a due process violation.

court found that evidence sufficient to create a genuine issue of material fact. (R. 43, Order Den. Summ. J., at PageID## 1199–1200). Again, we cannot disturb that holding.

Because Post undisputedly alleges a clearly established First Amendment violation, and the district court found genuine issues of material fact regarding Appellants's counterarguments, we AFFIRM the denial of qualified immunity at this stage of litigation.

## B. Statutory Immunity

We review de novo the denial of summary judgment on a claim for statutory immunity, "construing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party." *Sabo v. City of Mentor*, 657 F.3d 332, 336–37 (6th Cir. 2011).

In Ohio, municipal employees enjoy a presumption of immunity, *id.*, unless, as relevant to this case, "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." O.R.C. § 2744.03(A)(6)(b). Malicious purpose requires a willful and intentional act with purpose to cause harm, implying "an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Stepp v. Medina City Sch. Dist. Bd. of Educ.*, 71 N.E.3d 609, 617 (Ohio Ct. App. 2016) (internal quotation marks and citation omitted). "The term bad faith embraces more than bad judgment or negligence; it is conduct that involves a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Id.* (internal quotation marks and citation omitted). "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.* at 618 (internal quotation marks and citation omitted). And "[r]eckless conduct is characterized by the conscious disregard of or

indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct," and requires that the defendant "be conscious that his conduct will in all probability result in injury" and have "a perverse disregard of a known risk." *Id.* (alteration in original) (internal quotation marks and citations omitted). Whether a government employee acted with the intent necessary to overcome the presumption of immunity is typically a jury question. *Chesher*, 477 F.3d at 800, 802 (citing *Fabrey v. McDonald Vill. Police Dep't*, 639 N.E.2d 31, 35 (Ohio 1994)).

The issue here is whether Post has provided admissible evidence that could permit a jury to find that the defendants acted in a way that "falls within the § 2744.03(a)(6)(b) exception." *Id.* at 801; *see also Hidden Vill.*, 734 F.3d at 529–30. If he has not, he has failed to overcome the presumption of immunity, and we must reverse the district court as a matter of law.

Post raised three state-law claims: defamation, malicious prosecution, and civil conspiracy. The district court granted summary judgment on these claims to the City and Kostoff and denied it to Armstrong and Hughes. (R. 43, Order Den. Summ. J., at PageID# 1215). We AFFIRM the denial of statutory immunity for Hughes on all three claims, AFFIRM the denial of statutory immunity for Armstrong on Post's defamation and civil conspiracy claims, and REVERSE the denial of statutory immunity for Armstrong on Post's malicious prosecution claim.

## 1. Defamation

"In Ohio, defamation occurs when a publication contains a false statement made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." *Jackson v. Columbus*, 883 N.E.2d 1060, 1064 (Ohio 2008) (internal quotation marks and citation omitted). "To establish defamation, the plaintiff must show (1) a

false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published,[6] (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement." *Am. Chem. Soc'y v. Leadscope, Inc.*, 978 N.E.2d 832, 852 (Ohio 2012) (quoting *Pollock v. Rashid*, 690 N.E.2d 903, 908 (Ohio Ct. App. 1996)). Whether an allegedly defamatory statement is actionable—i.e. may go to a jury—is a question of law to be determined by the court. *Id.* at 853.

### a. Armstrong

Post alleges that Armstrong defamed him by telling Chief Hughes and Munroe Falls City Council that Post was the aggressor during their December 3, 2017, parking lot confrontation. The district court pointed to "Armstrong's report of Post's 'insubordination and untruthfulness'" as statements a reasonable juror could find to be defamatory. (R. 43, Order Den. Summ. J., at PageID# 1206). Armstrong's statements could constitute defamation under Ohio law. "An allegation that one has acted unprofessionally constitutes defamation per se." *Kanjuka v. MetroHealth Med. Ctr.*, 783 N.E.2d 920, 927 (Ohio Ct. App. 2002). We therefore agree with the district court's holding that Post provided sufficient evidence from which a jury could conclude that Armstrong's report of Post's unprofessionalism to Chief Hughes and City Council constitutes defamation.

Whether Post overcame Ohio's presumption of immunity is trickier. Post alleges that Armstrong concocted a "false narrative" of the confrontation in which he labeled Post as the aggressor, but Post also acknowledges taking actions that a juror could reasonably believe made

---

[6] Importantly in this case, Ohio allows liability for a defamatory statement published to a single person, even a person enjoined to secrecy. *Gilbert v. WNIR 100 FM*, 756 N.E.2d 1263, 1276 (Ohio Ct. App. 2001).

him the aggressor.[7]   And, as noted above, Post's rendition of the fight barely differs from Armstrong's.

Ultimately, Post claims that, when speaking to Hughes and Munroe Falls City Council, Armstrong overstated Post's actions by saying that Post was insubordinate and untruthful.  A reasonable juror could believe Post and conclude that Armstrong told this lie with a malicious purpose, in bad faith, or in a wanton or reckless manner, or, at minimum, downplayed his role in the altercation with a conscious indifference and disregard to the risk that Post would be punished. Therefore, at this stage of the litigation, Armstrong is not entitled to statutory immunity on Post's defamation claim.

### b. Hughes

The district court held that Post "produced evidence from which reasonable jurors could find that Hughes published false statements about him with retaliatory motive and a reckless disregard as to their truth or falsity."  (R. 43, Order Den. Summ. J., at PageID## 1206–07).  We focus on two writings: Hughes's statement after the Summit County Sheriff's investigation and his press release after firing Post.  The statement repeatedly accused Post of unprofessional conduct—insubordination—from which a jury could find defamation.  *Kanjuka*, 783 N.E.2d at 927.  The press release accused Post of violating both city policy and Ohio law.  "[W]ritten statements which falsely charge the plaintiff with the commission of a crime" are actionable

---

[7] Armstrong admitted that he approached Post and immediately asked him "do you have a problem with me," referring to the newspaper article.  Armstrong also admitted during the Summit County Sheriff's investigation that he hit Post's truck window (he claimed he knocked on the window because he wanted Post to roll it down to speak with Hughes, whom Armstrong had called).  Post admitted to repeatedly asking Armstrong "[w]hy are you looking at me like that" and turning himself in his truck so his body faced Armstrong's.  Each man apparently expected the other to escalate the incident into a physical altercation.

defamation. *Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Servs., Inc.*, 611 N.E.2d 955, 962 (Ohio Ct. App. 1992). A jury could conclude that both constituted defamation.[8]

Hughes's immunity claim for the press release is based on his contention that he did not know of the prior chief's FI card policy when he published the press release. Even if he did not know, we can consider whether there is evidence that he actively worked to avoid finding out. Hughes never interviewed Post during the pendency of the LEADS investigation (despite being advised to by counsel). But the record indicates that in his prior LEADS investigations, Hughes interviewed both accused officers multiple times. Based on Post's testimony at deposition for this case, a reasonable juror could find that had Post been interviewed, he would have told Hughes about the Department policy and his training to use LEADS. And a reasonable juror could conclude that Hughes *knew* that Post believed he was required to access LEADS to complete an FI card—Post made this argument at the pre-disciplinary hearing that Hughes attended before issuing the press release and a declaration supporting Post claims Post made the policy known "immediately" in response to the LEADS allegations. Additionally, Post's actions on the night in question—specifically running a LEADS search on everyone present, including those with whom he agreed—support the inference that Post thought he was following Department policy. From this, a reasonable juror could conclude that Hughes acted with a conscious disregard for the potential that Post was following Department policy when he accessed LEADS, and that Hughes wrote and published his press release with a conscious knowledge that Post would be injured and with a perverse disregard for the known risk that Post had followed Department policy. This evidence of reckless conduct could overcome Ohio's presumption of immunity.

---

[8] We focus on these two examples because Post has provided evidence of actionable defamation from which Hughes's immunity claim could arise. We do not intend to limit Post to these two statements at trial.

Hughes's immunity claim fares no better with his statement disagreeing with the Sheriff's investigation. Hughes published the statement despite previously believing that he was too involved to properly investigate the altercation himself. Additionally, Hughes admitted at deposition that he wrote the statement in response to what he believed was an unfair portrayal of the situation on Facebook and in the *Sentry*. A reasonable juror could conclude that Hughes released this statement with a malicious or reckless intent sufficient to overcome Ohio's presumption of immunity.

Therefore, Hughes is not entitled at this time to statutory immunity on Post's defamation claim.

### 2. Malicious Prosecution

"The tort of malicious prosecution in a criminal setting requires proof of three essential elements: (1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Froehlich v. Ohio Dep't of Mental Health*, 871 N.E.2d 1159, 1162 (Ohio 2007) (internal quotation marks and citation omitted). We review the record to determine whether Post produced evidence from which a jury could find that Appellants acted with the requisite mental state to overcome the presumption of immunity.

#### a. Armstrong

The district court held that "[t]he record suggests that Armstrong played a critical role in influencing Post's LEADS investigation and seeking his prosecution," pointing to a portion of Armstrong's deposition. (R. 43, Order Den. Summ. J., at PageID# 1210). But in that portion of his deposition, Armstrong does not say that he directed anyone to investigate Post. (R. 30, Dep. of Armstrong, at PageID## 611–16). Rather, that testimony suggests that his knowledge of Post's actions and Ohio's LEADS laws came directly from DiCaudo, the City's police legal advisor. (*Id.*

at PageID## 613, 615–16). Nor does Post identify any additional evidence in the record detailing Armstrong's role in the decision to prosecute him.

This leaves us with one record-supported inference: that Armstrong relied on advice of counsel (the City's police legal advisor). At worst, this inference suggests that Armstrong trusted his subordinates to accurately report the facts and law to him. Though this might show negligence, it is insufficient to overcome Ohio's presumption of immunity. *See Stepp*, 71 N.E.3d at 618 (the lowest level of culpability that overcomes Ohio's presumption of immunity under O.R.C. § 2744.03(A)(6)(a) is recklessness, which "is substantially greater than negligent conduct" (citation omitted)).

Therefore, no reasonable juror could conclude that Armstrong acted with a scienter great enough to overcome the presumption of immunity. Armstrong is entitled to statutory immunity on Post's malicious prosecution claim.

### b. Hughes

The district court held that Post established evidence "suggest[ing] that Hughes purposefully excluded exculpatory evidence [namely, the prior city policy] from the investigative file lodged against Post." (R. 43, Order Den. Summ. J., at PageID# 1209). We agree. There remains an issue of material fact regarding when Hughes learned of the Department FI card policy (and of Post's training to use LEADS to complete FI cards), and whether Hughes consciously disregarded evidence that the policy existed. If Hughes knew of the potentially exculpatory evidence before submitting the investigative file to the prosecutor's office, a reasonable juror could find that he acted with the intent necessary to overcome the presumption of immunity.

We find unavailing (at this stage) Hughes's argument that the grand jury indictment absolves him of wrongdoing. "When a grand jury returns an indictment against a defendant, this

creates a presumption of probable cause." *Jackson v. City of Cleveland*, 925 F.3d 793, 821 (6th Cir. 2019) (internal quotation marks and citation omitted). However, the presumption is rebuttable if:

> (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury).

*King v. Harwood*, 852 F.3d 568, 587–88 (6th Cir. 2017); *see also Jackson*, 925 F.3d at 821 (applying *King* to malicious prosecution under Ohio law). There remain issues of material fact regarding whether Hughes knew of (1) the FI card policy and (2) Post's use of LEADS to check the other individuals present on the night in question when he submitted the investigation report. The district court held that Post presented sufficient evidence to "suggest[] that Hughes purposefully excluded exculpatory evidence from the investigative file lodged against" Post, and "that Hughes made material omissions of fact to the grand jury that charged" Post. (R. 43, Order Den. Summ. J., at PageID# 1209). As these are determinations of evidentiary sufficiency, we may not disturb them.

Therefore, at this stage, Hughes is not entitled to statutory immunity on Post's malicious prosecution claim.

### 3. Civil Conspiracy

Civil conspiracy in Ohio requires "malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Siefert v. Hamilton County*, 951 F.3d 753, 768 (6th Cir. 2020) (citation omitted). We review to

determine whether the Appellants possessed the requisite mental state sufficient to overcome the presumption of immunity.

Because there is sufficient evidence for a jury to find that both Armstrong and Hughes acted with malicious purpose, in bad faith, or with wanton or reckless disregard when handling their multiple investigations into Post, there is likewise sufficient evidence for a juror to find that Armstrong and Hughes acted with an intent sufficient to overcome the presumption of immunity when working together on these investigations.

Therefore, at this point, Armstrong and Hughes are not entitled to statutory immunity on Post's civil conspiracy claim.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the denial of qualified immunity to all Appellants, AFFIRM the denial of statutory immunity to Hughes on Post's state-law claims, AFFIRM the denial of statutory immunity to Armstrong on Post's defamation and civil conspiracy claims, and REVERSE the denial of statutory immunity to Armstrong on Post's malicious prosecution claim. We REMAND for proceedings consistent with this opinion.